**VIROMED LABORATORIES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**Center for Disease Detection, LLC, Defendant–Intervenor.**

No. 04–0021C.

United States Court of Federal Claims.

Filed: Aug. 26, 2004 [1].

Reissued for Publication Sept. 10, 2004.

Thomas L. McGovern III, Hogan & Hartson LLP, Washington, DC, for the plaintiff. Michael J. Vernick, Hogan & Hartson LLP, Washington, DC, of counsel.

Christian J. Moran, Trial Attorney; Jeanne E. Davidson, Deputy Director; David M. Cohen, Director, Commercial Litigation Branch, Civil Division; Peter D. Keisler, Assistant Attorney General, United States Department of Justice, for the defendant. Major Robert Neill, Contract Appeals Division, United States Department of the Army, of counsel.

Walter F. Zenner, Arnold & Porter LLP, Washington, DC, for the intervenor.

## OPINION

HORN, Judge.

This is a post-award bid protest brought by ViroMed Laboratories, Inc. (ViroMed), challenging the United States Army Medical Command's (MEDCOM's) decision to award a contract to Center for Disease Detection,

1. This opinion was issued under seal on August 26, 2004. The parties were instructed to identify protected material subject to redaction. In response, the parties have stipulated that the opinion does not contain protected material. The original opinion is, therefore, reissued unsealed.

LLC (CDD) on September 5, 2003.[2] ViroMed seeks declaratory and injunctive relief in this court, raising two issues in its complaint: (1) whether MEDCOM improperly accepted a proposal that failed to comply with a mandatory requirement in the solicitation to complete two HIV screening "proficiency panel" tests using procedures that precisely matched those the offeror proposed to use under the contract and (2) whether MEDCOM erred in failing to conduct a price realism evaluation of the awardee's proposed prices. Under the solicitation as issued, proper certification is a threshold to meeting solicitation requirements. Without the required certification, bids should have been disqualified and the price realism issue thereby is rendered moot.

The defendant filed a motion for remand of the procurement to the agency, requesting that the case be returned to the MEDCOM contracting officer because the administrative record reveals that neither ViroMed nor CDD submitted the testing certification required by the solicitation. The defendant believes that neither party was eligible for the award because they failed to comply with the solicitation requirements. In addition, defendant has advised the court that the contracting officer, Raineye Holmes, intends, if permitted, to terminate the contract award to CDD, delete the certification requirement by issuing an amendment to the solicitation, and give CDD and ViroMed the opportunity to submit limited revisions to their proposals stemming from the minimally amended solicitation. The contracting officer would then make a new source selection decision. Defendant, at the court's request, also outlined three other alternatives to the deletion of the certification requirement, but requested that the appropriate form of corrective action be left to the Army's discretion, with the court's role limited to advising the defendant of any options the court deemed foreclosed to the Army as a matter of law. Defendant also advised the court that cancellation and resolicitation of the medical testing services, as an alternative, would be costly for the Army to implement, and would be the most time consuming. The intervenor similarly did not recommend cancellation and resolicitation, and suggested other alternatives similar to the defendant's alternatives to address the certification issue. Plaintiff advised the court that cancellation and resolicitation would be acceptable as a way to address the certification issue, but opposed other alternatives which simply deleted the certification requirement, or which permitted CDD to cure its certification deficiencies, leading, in plaintiff's view, inexorably to a re-award of the contract at issue to CDD.

## FINDINGS OF FACT

On May 23, 2001, MEDCOM issued solicitation No. DADA10–01–R–0009 at Fort Sam Houston, Texas, seeking fixed-unit-price proposals to perform various blood testing and related services, including the testing of samples provided by members of the United States Army, United States Army Reserve, National Guard, and the United States Coast Guard. MEDCOM announced its initial contract award to CDD in February, 2002. The plaintiff, ViroMed, has been the incumbent contractor for this effort since 1997, and has been performing under extensions and bridge contracts since 2002 when plaintiff protested MEDCOM's initial award of the contract to CDD under the solicitation. The plaintiff continues to perform the contract pending resolution of this case.

ViroMed filed this action following a series of bid protests at the GAO beginning in February, 2002. ViroMed filed its initial protest (B–289959.1) on February 20, 2002, challenging MEDCOM's award to CDD. Because of MEDCOM's decision to take corrective action, including a new technical evaluation, past performance evaluation, and source selection decision, the GAO dismissed the protest as "academic." ViroMed filed its second protest (B–289959.2) on August 14, 2002 and a supplemental protest (B–289959.3) on September 23, 2002. MEDCOM advised the GAO of its intention to take corrective action, consisting of a required proof of United States Food and Drug Administration (FDA) blood bank certification from both offerors and re-evaluation of the existing final price proposals from both

2. CDD was granted permission to intervene as a party defendant in this case.

offerors. On November 8, 2002, the GAO dismissed ViroMed's second protest as "academic." ViroMed filed its third protest (B–289959.4) on January 2, 2003, challenging MEDCOM's implementation of its corrective action of allowing offerors to submit proof of current FDA registration, thereby relaxing solicitation requirements. On April 1, 2003, the GAO dismissed the protest as untimely. ViroMed filed its fourth protest (B–289959.5) on June 2, 2003, regarding a material mathematical error that inflated the perceived price differential between ViroMed and CDD. On July 23, 2003, because of MEDCOM's decision to take corrective action, the GAO dismissed the protest as "academic." On July 24, 2003, ViroMed filed a request to the GAO (B–289959.6) for reimbursement of the costs incurred as a result of having to file a protest caused by MEDCOM's material mathematical error and previous successful protests. On September 16, 2003, ViroMed filed its fifth protest (B–289959.7), asserting that MEDCOM improperly evaluated CDD's and ViroMed's technical proposals as substantially equal, failed to perform a proper price realism analysis, and failed to properly evaluate the offerors' past performance. In this final GAO bid protest (No. B–289959.7), ViroMed argued both of the two protest grounds that it later raised in the complaint before this court. On December 19, 2003, the GAO denied ViroMed's protest (No. B–289959.7), rejecting ViroMed's allegations concerning price realism and holding that ViroMed's challenge to CDD's proficiency panel certification was untimely.

In response to the GAO bid protests, MEDCOM took corrective action on three occasions. In each instance, MEDCOM determined that ViroMed's and CDD's technical proposals were substantially equivalent, thereby making price the determinative evaluation factor. CDD's proposed price of $21,361,184.00 was lower than ViroMed's proposed price of $21,994,203.10 by $633,019.10. ViroMed protested each of MEDCOM's award decisions at the GAO. As a result of each of these protests, CDD's performance of the contract awarded to it under the solicitation was stayed pending resolution of the protest.

The solicitation contemplated a negotiated, fixed-price, indefinite-delivery/indefinite-quantity (ID/IQ) procurement of various laboratory testing services, principally including HIV screening tests. The solicitation included ten different contract line item numbers (CLINs) in each year, which were organized in the base year as follows:

| | |
|---|---|
| HIV Screening | CLINs 0001, 0002 and 0003 |
| Blood Bank Testing | CLINs 0004AA, AB, AC, AD, AE and AF |
| Human Papillomavirus (HPV) Screening | CLIN 0006 |
| Immunity Panel | CLINs 0005, 0007, 0008 and 0009 |
| Data Management | CLIN 0010 (used only in the base year) |

CLINs 0001–0003, which involved HIV screening, were the most significant portions of the solicitation from the standpoint of both the estimated quantity of tests performed and price.[3] For HIV screening, blood samples were initially to be tested using the Enzyme–Linked Immuno Sorbent Assay (ELISA) methodology. If any of these initial screening tests produced a positive result, confirmatory testing was required to be undertaken through the use of the more expensive, but more precise, Western Blot methodology. In the statement of work, the solicitation states that the contractor "shall provide qualified personnel and all services, material, equipment, supplies and facilities necessary to perform testing services to detect antibodies and antigens employing Food and Drug Administration (FDA) approved test methodologies."

The solicitation contained the clause at FAR 52.212–2, "Evaluation–Commercial Items (Jan 1999)," which provided, in part, as follows:

(a) The Government will award a contract resulting from this solicitation to the responsible offeror whose offer conforming to the solicitation will be most advantageous to the Government, price and other factors considered. . . .

3. For example, MEDCOM contemplated ordering 530,000 HIV screening tests in each full year

of the program.

Award will be made to the offeror whose proposal offers the best overall value to the government....

In selecting the offer most advantageous to the government, the following factors will be considered:

Factor 1: Technical Quality (Oral Presentation)

Subfactor (A) Understanding Scope of Work

Subfactor (B) Management Capability

Subfactor (C) Quality Control

Factor 2: Past and Present Performance

Factor 3: Technical Part II

Factor 4: Financial Capability

Factor 5: Price/Cost

All evaluation subfactors of Technical Quality are approximately equal in importance....

All evaluation factors other than Price/Cost, when combined are significantly more important than Price/Cost. The government is interested in proposals that offer the best value in meeting the requirements—technical quality and performance with acceptable risk at a fair and reasonable price. Factor 5 [Cost/Price], however, could become the determinative selection factor if technical quality proposals are determined to be substantially equal.

The solicitation also stated that:

A proposal that is unrealistic in terms of technical quality or price will be deemed reflective of an inherent lack of technical competence or indicative of failure to comprehend the complexity and risks of the contractual requirements. Such proposals may be rejected as unacceptable without further evaluation or discussion.

The solicitation also included the clause at FAR 52.212–1, "Instructions to Offerors–Commercial Items (Oct 1995)," which was modified to include a new paragraph (b), titled "Submission of offers." This revised FAR clause stated, in part, as follows:

PART V–FINANCIAL CAPABILITY. This instruction is to assist the offeror in developing and presenting information required to support the cost/price proposal.

Proper presentation and adequate supporting documentation will ensure that the price/cost proposal will be evaluated fairly by the government. Offerors are required to submit narrative explanation and justification to support the reasonableness, completeness, and realism of their cost proposal. FAILURE TO PROVIDE ADEQUATE COST DATA IN A SATISFACTORY FORMAT MAY DELAY CONSIDERATION OF THE PROPOSAL OR MAY RESULT IN THE OFFEROR BEING DECLARED UNACCEPTABLE.

a. The cost proposal must be submitted in duplicate .... All information relating to cost or pricing must be included in this section of the proposal and defined as Cost/Pricing Data. This volume will stand alone in supporting the offeror's approach to reasonableness, completeness, and realism of the overall price of this effort....

(emphasis in original).

In its revised version of FAR 52.212–1, "Instructions to Offerors–Commercial Items (Oct 1995)," the solicitation stated, in part, as follows:

PART III–TECHNICAL. The technical proposal will consist of two separate and distinct submissions, referred to as Part I and Part II, and are due on two separate dates as described below. Only those offerors determined to be within the competitive range (after evaluation of both the cost proposal and Part I of the technical proposal) will be qualified to participate in Part II....

TECHNICAL PART II

a. Those offerors determined to be within the competitive range will be notified as soon as possible after closing date and will be required to complete, as technical proposal Part II, two proficiency testing panels, each of which will consist of 20 specimens requiring Western Blot technique only on Panel # 1 and Recombinant ELISA methodology only on Panel # 2. Each set of panels furnished to each prospective offeror will be of equal complexity and difficulty....

b. The offerors are responsible for pickup of the proficiency panels from... Wal-

ter Reed Army Institute of Research ... on 11 JUL 01....

c. The required results as described below must be returned to the same location by 3:00 P.M. on 16 JUL 01 (local prevailing time). Failure of the offeror to submit technical proposal Part II consisting of the required results by the designated date and time will be regarded as a failure to submit a timely proposal in response to this solicitation and is subject to paragraph (f) of FAR clause 52.212–1. *Test panel results must be accompanied by a certification, signed by the laboratory supervisor, certifying that the administration of the prescribed tests were accomplished in the precise manner that the offeror would employ in the performance of this contract....*

(emphasis added).

In response to the solicitation, five proposals were submitted by the initial closing date in June, 2001. ViroMed, CDD, and a third offeror made oral presentations to the agency in July, 2001.[4] Following oral presentations, CDD and ViroMed each performed proficiency panel testing on two 20–sample panels of specimens provided by the agency. MEDCOM required offerors to complete proficiency panels to demonstrate their ability to produce consistently accurate test results. To ensure this proficiency panel testing was relevant to contract performance, MEDCOM required each offeror to demonstrate their technical competency by accomplishing the prescribed tests "in the precise manner that the offeror would employ in the performance of this contract." ViroMed used rLAV and VIR test kits for the ELISA portion of the proficiency panel tests, and the Cambridge Biotech test kit to perform the Western Blot proficiency panel tests. CDD used the Bio–Rad Laboratory ELISA HIV test kit, and a Novablot machine for the Western Blot proficiency panel tests. Both ViroMed and CDD submitted the results of their proficiency panel tests to MEDCOM by the end of July, 2001. Based upon these results, the Army subsequently determined that both ViroMed and CDD had received perfect scores of 100 percent on their respective proficiency panel tests.

In the oral presentation of its technical proposal (given to MEDCOM on July 13, 2001), CDD stated that it intended to acquire and install a Fully Automated ELISA Workstation, or FAME system for use in performing ELISA HIV screening tests under the contract. CDD further stated that it did not expect to receive its first FAME system until the middle of August, 2001 at the earliest. It is undisputed that CDD did not use a FAME system to perform its proficiency panel tests. CDD eventually began receiving the FAME system on September 27, 2001 and switched all of its HIV testing to the FAME system by October 12, 2001. Based upon CDD's own proposal and correspondence, MEDCOM knew that CDD did not have the FAME system until September, 2001, which was after the due date in July, 2001 for submitting the results of the proficiency panel tests.

The GAO decision denying ViroMed's last protest (B–289959.7) stated, in part, as follows:

> In its June 2, 2003 protest, ViroMed, for the first time, asserted that CDD's proposal failed to comply with the solicitation requirement to submit a certification with the proficiency panel testing performed by the offerors in July 2001.... ViroMed maintains that CDD could not possibly have complied with [the] certification requirement since CDD's proposal expressly provided that CDD intended to perform the vast majority of the contract's testing requirements using an automated system that CDD had not installed, or even acquired, at the time the July 2001 proficiency panel tests were performed.... However, ViroMed's counsel, who were admitted to the protective order for this protest, received all of the information discussed above in the September 2002 agency report that responded to ViroMed's August 2002 protest. Accordingly, to comply with our Bid Protest Regulations regarding

---

4. Two of the five offerors withdrew from the competition prior to oral presentations. The third offeror was determined to be outside the competitive range following oral presentations, leaving ViroMed and CDD in the competition.

timely submission of protest issues, ViroMed was required to identify CDD's alleged failure to comply with the certification requirement no later than 10 days after receiving the September 2002 agency report. Since ViroMed failed to do so, this matter is not timely raised, and we will not further consider it.

ViroMed Laboratories, Inc., Comp. Gen. B–2899589.7, Dec. 19, 2003, at 7 n. 15 (citations omitted).

ViroMed also challenges the price realism analysis of CDD's proposal. By way of definition, FAR 15.404–1(b)(1) states that "[p]rice analysis is the process of examining and evaluating a proposed price without evaluating its proposed separate cost elements and proposed profit." A cost realism analysis, as defined by FAR 15.404–1(d)(1), is a process different from price analysis, as defined by FAR 15.404–1(b)(1).[5]

MEDCOM's evaluation of price proposals on August 12, 2003, consisted of an analysis comparing the offerors' total prices and individual CLINs to each other and to ViroMed's current bridge contract. In this regard, the GAO decision denying ViroMed's final protest stated, in part, as follows:

> Although ViroMed asserts that the agency's evaluation of technical quality was unreasonable, its criticisms in this regard rely entirely on the assertion that CDD offered unrealistically low prices. Further, ViroMed's assertions do not address CDD's total proposed price—which is very close to ViroMed's; rather, ViroMed's arguments focus on only two CLINs—one requiring blood bank confirmatory testing and one requiring automation support—which constitute only a small portion of the overall contract requirements. In short, ViroMed maintains that CDD's fixed-price proposal to perform these two CLINs at a price lower than the level of costs ViroMed anticipates it will incur in performing these functions required the agency to conclude

that CDD did not understand the contract requirements. We disagree.

> Based on our review of the complete protest record, including the tapes of CDD's oral presentations and CDD's written responses to the agency's discussion questions, and taking into consideration the relatively small portion of the total contract requirements that these two CLINs represent, we find no basis to question the reasonableness of the agency's assessment regarding CDD's understanding of the contract requirements and its conclusion that the two proposals were substantially equal with regard to technical quality.

ViroMed Laboratories, Inc., Comp. Gen. B–2899589.7, Dec. 19, 2003, at 10 (footnote omitted). Though ViroMed raises its price realism claim before this court, the issue is mooted by the court's decision on the testing certification issue, and will not be further addressed.

## DISCUSSION

The Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996), amended the Tucker Act and provided the United States Court of Federal Claims with post-award bid protest jurisdiction for actions filed on or after December 31, 1996. See 28 U.S.C. § 1491(b)(1)-(4) (2000). The statute provides that post-award protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970) and the line of cases following that decision. See, e.g., *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed.Cir.2004); *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed.Cir.), reh'g and reh'g en banc denied (2003); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir. 2001).

---

5. FAR 15.404–1(d)(1) states that:

Cost realism analysis is the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal.

Agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (2)(D) (2000); *see Banknote Corp. of Am. v. United States*, 365 F.3d at 1350 ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (quoting *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed.Cir. 2000)).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed.Cir.1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971)); *see also Seaborn Health Care, Inc. v. United States*, 55 Fed.Cl. at 523 (quoting *Honeywell, Inc. v. United States*, 870 F.2d at 648 (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir. 1971))). As stated by the United States Supreme Court:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted).

As the proceedings in the case before this court unfolded, it became clear that the threshold issue is whether ViroMed and CDD satisfied the solicitation requirement to certify that their proficiency panel submissions were completed in the "precise manner" that they intended to perform under the contract. The solicitation requires that "[t]est panel results must be accompanied by a certification, signed by the laboratory supervisor, certifying that the administration of the prescribed tests were accomplished in the *precise manner* that the offeror would employ in the performance of this contract." (emphasis added). Reluctantly, the court finds that neither CDD nor ViroMed accompanied these proficiency tests with the proper certification. Both parties failed to submit a certified document with language that would indicate that the offeror will perform the contract precisely as they performed the panel testing. Accordingly, the plaintiff's complaint is dismissed. Given the court's conclusions on the certification issue, the court need not reach the price realism issue raised by the plaintiff regarding whether MEDCOM erred in failing to conduct the "realism" evaluation called for by the solicitation.

The plaintiff, ViroMed, argues that it met the certification requirement in that ViroMed certified as to all of the underlying facts necessary to demonstrate that it performed the proficiency panel testing in precisely the same manner it proposed to test after contract award. ViroMed argues that in order to determine that the proficiency panel submission conformed to the underlying requirement, the court should compare "(a) the procedures spelled out on the proficiency panel test forms themselves that were *certified* by ViroMed to (b) the procedures proposed [for] performing the testing under the contract, as spelled out during ViroMed's oral technical presentation." (emphasis in original). The plaintiff states that for the ELISA panel,

ViroMed used precisely the same test kits, instruments and software on which it briefed MEDCOM during its oral technical presentation. Likewise, the plaintiff believes that ViroMed's Western Blot results were certified as having used precisely the same test kit and methodology described in its oral technical presentation.

ViroMed further contends that CDD did not conduct the tests in precisely the same way it proposed to perform the contract. According to ViroMed, at the time CDD completed the proficiency panels, it did not possess the automated testing system with which it proposed to perform the contract and, therefore, could not have completed the required certification. The plaintiff also asserts that MEDCOM knew that at the time CDD submitted the proficiency testing panels, CDD did not have its automated testing system in place and that, therefore, CDD could not have completed the proficiency panels in the "precise" way that it intended to perform the contract. In fact, MEDCOM later sent a letter to CDD querying CDD about the effect of its new automated system on its quality control capability. The plaintiff argues that given MEDCOM's knowledge concerning CDD's lack of the automated testing system with which it proposed to perform the contract's HIV screening services, MEDCOM's award to CDD was arbitrary, capricious and contrary to law.

The intervenor, CDD, argues that it administered the proficiency panel tests, "in all material respects," in the precise manner in which it proposed to perform the contract. CDD contends that the phrase "precise manner" can only mean "in all material respects"—not necessarily with the exact same equipment and personnel. CDD refers to the solicitation for guidance as to what is material: compliance with the solicitation's technical specifications, including the requirements to use FDA-approved test kits, to follow the FDA-approved package insert requirements, and to employ qualified laboratory personnel. Under this definition, CDD argues that CDD did, in fact, perform the proficiency panel test in the "precise manner" in which it proposed to perform the contract. The only difference between how

CDD performed the proficiency panel tests and how it proposed to perform the tests under the contract relates to the proposed use of the FAME system to perform the contract's ELISA testing. CDD argues that the FAME system is different only in that it provides an integrated housing for the four individual pieces of the equipment used for testing. The four components used by CDD to perform the proficiency panel tests are: (1) incubator, (2) plate washer, (3) pitpettor and (4) plate reader. The FAME system uses a robotic arm rather than a laboratory technician to move the testing plates from one piece of equipment to another, and it uses a mechanical switch rather than a technician to activate the trigger of an automatic pipettor. CDD argues these differences are perfectly permissible under the solicitation's technical specifications, including the requirements to use FDA-approved test kits, to follow the FDA-approved package insert instructions, and to employ qualified laboratory personnel. CDD asserts that both the manual and automatic methods meet all applicable requirements of the solicitation and of the FDA and that, therefore, the differences are immaterial.

CDD explains that the ELISA and Western Blot methodologies typically involve the use of commercially available test kits, which come in a range of types, tailored to the specific condition of interest. CDD contends that the solicitation required the exclusive use of FDA-approved test kits, which include the FDA-approved "package inserts" that provide detailed and precise instructions for performing the tests. The Bio–Rad package insert that CDD used in its performance test included a 14–step set of instructions for actually performing the ELISA HIV test. CDD asserts that it performed the ELISA portion of the proficiency panel tests following the precise procedures prescribed by the packaged insert. CDD used the automated systems to carry out each step in accordance with the FDA-approved package insert and industry norm. CDD argues that the FDA-approved package insert makes no distinction between moving the microplates manually or mechanically from one automated testing station to another. CDD explains that if the laboratory does not perform the tests in ac-

cordance with the FDA-approved instructions, the controls will not produce results, and the entire test run is rejected. Thus, when a laboratory fails to follow the FDA-approved instructions, the tests do not return inaccurate or unreliable results, but rather, they return no results at all.

CDD further argues that the FAME system is identical to those that CDD used to perform the ELISA portion of the proficiency panel test—that is, each component meets the same exacting specifications set forth in the FDA-approved package insert. CDD contends that there is no functional difference between a mechanical arm that lifts and moves the microplates from one section to another and a laboratory technician's arm performing the same function. CDD further asserts that there is no functional difference between the integrated pipettor used in the FAME system that is activated by an electronic switch versus the stand-alone pipettor that requires a laboratory technician to press a trigger. Once activated, both pipettors automatically measure and dispense a pre-set amount of reagent. Hence, CDD argues that it did in fact perform the proficiency panel tests in the "precise manner" in which it proposed to perform the contract.

■ The United States Court of Appeals for the Federal Circuit in *Banknote Corporation of America* stated that: "The principles governing interpretation of Government contracts apply with equal force to the interpretation of solicitations issued by the Government for such contracts. *See, e.g., Grumman Data Sys. [Corp. v. Dalton,]* 88 F.3d [990,] 997–98 [(Fed.Cir.1996)] (interpreting a solicitation using contract interpretation rules)." *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d at 1353 n. 4. The Federal Circuit further stated in *Jowett, Inc. v. United States* that:

> In interpreting a contract, we begin with the plain language. We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning. In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense.

*Jowett, Inc. v. United States,* 234 F.3d 1365, 1368 (Fed.Cir.2000) (citations omitted); *see also Hunt Constr. Group, Inc. v. United States,* 281 F.3d 1369, 1372 (Fed.Cir.2002) ("We begin with the plain language when interpreting a contract.... The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts.") (citations omitted); *Giove v. Dep't of Transp.,* 230 F.3d 1333, 1340–41 (Fed.Cir.2000) ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs.") (citations omitted); *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 388, 351 F.2d 972, 975 (1965) (The language of the "contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances.")

■ When the terms of a contract are clear and unambiguous, there is no need to resort to extraneous circumstances for its interpretation. *See Sea–Land Serv., Inc. v. United States,* 213 Ct.Cl. 555, 567, 553 F.2d 651, 658 (1977), *cert. denied,* 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978). Construction of an unambiguous writing, therefore, is an appropriate matter for summary judgment. *See Martin v. United States,* 20 Cl.Ct. 738, 745 (1990); *Kelley v. United States,* 19 Cl.Ct. 155, 161 (1989). A written agreement is ambiguous when a plain reading of the contract could result in more than one reasonable interpretation. *See also Metric Constructors, Inc. v. NASA,* 169 F.3d 747, 751 (Fed.Cir.1999); *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 997 (Fed.Cir. 1996); *A–Transport Northwest Co. v. United States,* 36 F.3d 1576, 1584 (Fed.Cir.1994) ("A contract is ambiguous only when it is susceptible to two reasonable interpretations."); *Tacoma Dep't of Pub. Utils. v. United States,* 31 F.3d 1130, 1134 (Fed.Cir.1994) (citing *Hills Materials Co. v. Rice,* 982 F.2d 514, 516 (Fed.Cir.1992)). It is not enough that the parties differ in their interpretation of the contract clause. *See Cmty. Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1578

(Fed.Cir.1993). Nor may a court look to extrinsic evidence in determining whether a contract is ambiguous. *See McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1996); *Tacoma Dep't of Pub. Utils. v. United States,* 31 F.3d at 1134 ("Outside evidence may not be brought in to create an ambiguity where the language is clear."); *Interwest Constr. v. Brown,* 29 F.3d 611, 615 (Fed.Cir.1994) ("Extrinsic evidence ... should not be used to introduce an ambiguity where none exists."). However, because an ambiguous or uncertain writing sometimes can only be understood upon consideration of the surrounding circumstances, extrinsic evidence will be allowed to interpret an ambiguous clause. *See Sylvania Elec. Prods., Inc. v. United States,* 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972). "[T]he court will construe the ambiguous term against the drafter of the contract when the nondrafter's interpretation is reasonable." *Hills Materials Co. v. Rice,* 982 F.2d 514, 516–17 (Fed. Cir.1992) (citing *Fort Vancouver Plywood Co. v. United States,* 860 F.2d 409, 414 (Fed. Cir.1988)).

Summarizing the rules of interpretation for contracts and solicitations, the Federal Circuit recently stated in *Banknote Corporation of America* that:

> We begin with the plain language of the document. *Coast Fed. Bank, FSB v. United States,* 323 F.3d 1035, 1038 (Fed.Cir. 2003) (en banc). The solicitation is ambiguous only if its language is susceptible to more than one reasonable interpretation. *See Grumman Data Sys.,* 88 F.3d at 997. If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning; we may not resort to extrinsic evidence to interpret them. *Coast Fed. Bank, FSB v. United States,* 323 F.3d at 1038. Finally, we must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions. *Id.*

*Banknote Corp. of Am., Inc. v. United States,* 365 F.3d at 1353.

█ Defendant acknowledges that MEDCOM never informed CDD of any perceived deficiencies in the manner in which CDD performed its proficiency panel testing, and, for that matter, that the MEDCOM contracting officer never reviewed whether or not either offeror performed the proficiency panel tests in the "precise manner" contract testing would be performed. Defendant concludes that, at this stage, it is "unclear" as to whether either offeror complied with the "precise manner" requirement. Defendant argues that the solicitation could be amended to define the phrase "precise manner," thereby clarifying MEDCOM's proficiency panel requirement. Defendant also states, "[h]owever, the attempt to define a vague phrase like 'precise manner' may lead to more disputes and litigation."

ViroMed presents a narrow interpretation of the phrase "precise manner," by which the parties would be required to use the precise equipment in the proficiency panel testing which would be used in the performance of the contract. ViroMed's interpretation of "precise manner," while a compliant reading of the solicitation, is not the only reasonable interpretation. To meet the solicitation requirements, a reasonable reading of the words would not make it necessary to use the same exact equipment and personnel to perform the proficiency panel testing and to perform under the contract.

MEDCOM knew that CDD was performing the proficiency panel testing on the manual equipment, not the FAME system, and did not perceive it to be in noncompliance with the solicitation requirements. In an August 27, 2001 letter to CDD, MEDCOM inquired about CDD's "capability of performing under an automated testing system which will be brought in after the award of the contract." Acknowledging that an automated system would be brought in after the award of the contract, MEDCOM inquired regarding the need for extensive correlation studies and retraining of testing personnel and how CDD proposes to accomplish the correlation studies and personnel retraining. CDD responded, "we will have been running the [FAME] system for our daily needs for nearly two months before your first specimens arrive at CDD. Thus, we will be prepared to perform your tests well before the

time required by the solicitation." Despite knowledge that CDD did not perform the proficiency panel testing with the proposed FAME system, MEDCOM did not perceive CDD's situation to be in noncompliance with the solicitation. The court finds that CDD presents a reasonable interpretation of the present solicitation language. The FDA-approved test kits give instructions as to which equipment should be used and how to perform the panel testing. The instructions with the test kit offer the option of using manual or automatic equipment. The issue, however, is whether CDD or ViroMed met the certification requirement of the solicitation.

ViroMed believes it complied with the certification requirement and CDD did not. Therefore, plaintiff contends the appropriate remedy is to fashion injunctive relief requiring MEDCOM to award the contract to ViroMed. ViroMed concedes, however, that it did not submit a single piece of paper stating, "these tests were performed in the precise manner that the offeror will employ in the performance of this contract." ViroMed argues that the solicitation at issue did not specify the exact form that the required certification had to take or contain certification language to be copied, signed and submitted. The direction in the solicitation stated: "Test Panel results must be accompanied by a certification, signed by the laboratory supervisor, certifying that the administration of the prescribed tests were accomplished in the precise manner that the offeror would employ in the performance of this contract." ViroMed argues that its laboratory supervisor certified, for example, that an "rLAV" test kit was actually used for the initial proficiency panel ELISA testing and a "VIR" test kit was actually used for repeat ELISA testing, then, during its oral technical presentation to MEDCOM, accompanied by slides, ViroMed proposed to use the same rLAV and VIR test kits for contract testing. Similarly, ViroMed certified that it actually used the Cambridge Biotech test for the Western Blot proficiency panel testing, then, during its oral technical presentation to MEDCOM, accompanied by slides, ViroMed proposed to use the same Cambridge Biotech test for contract testing. ViroMed argues, therefore,

that the totality of these events, effectively, represents a certification that plaintiff would perform the contract testing in the precise manner that it performed the proficiency panel testing.

ViroMed cites the case of *Blake Construction Co.*, in which the undersigned judge stated that:

> Thus, more than one document, such as several letters and other documents referenced in a document, as in the case at bar, may be construed together to form a claim, and may be included in the consideration of what constitutes a claim under the statute [the Contract Disputes Act, 41 U.S.C. §§ 601–613 (1982)].

*Blake Constr. Co. v. United States*, 28 Fed. Cl. 672, 682 (1993), *aff'd*, 29 F.3d 645 (Fed. Cir.1994) (table). In *Blake Construction Co.*, the court found that three letters submitted to the government by the claimant satisfied the requirements of a properly certified claim under the Contract Disputes Act. *Id.* at 683. *Blake Construction Co.*, however, is distinguishable from the present case in that ViroMed was required by the solicitation to certify "that the administration of the prescribed tests were accomplished in the precise manner that the offeror would employ in the performance of this contract," and no such certification is found either in one document, or in multiple documents in the record.

Upon analysis, there is no language in any of the documents in the administrative record that ViroMed satisfied the certification requirement of the solicitation. The certified ELISA and Western Blot test results and work papers submitted by ViroMed only warrant that the proficiency panel tests were conducted. ViroMed did not go further and provide a certification that "rLAV" and "VIR" test kits would be used for ELISA testing under the contract, and that the Cambridge Biotech test would be used for the Western Blot test under the contract. No certified documents indicate how testing under the contract will be conducted. ViroMed appears to have indicated in an oral presentation to MEDCOM its intention to use certain tests, but that intention falls short of the

written certification required by the solicitation.

ViroMed also attempts to forge a certification argument based on the DD Form 250 it submitted to MEDCOM, which is titled a "Material Inspection and Receiving Report." Plaintiff states that the proficiency panel testing results were submitted to MEDCOM under the cover of the DD Form 250, that a ViroMed laboratory official signed the form beneath preprinted language on the form stating that the "listed items" (the proficiency panel test results) "conform to contract." ViroMed states that it intended the DD Form 250 "to inform MEDCOM that its proficiency panels were completed in accordance with the Solicitation's requirements, *i.e.,* that they were completed in the precise way that ViroMed intended to perform the contract." Plaintiff, however, reads too much into the Material Inspection and Receiving Report, which merely indicates that the test result were provided as required, and not that ViroMed would perform the tests during the upcoming contract in the precise manner the tests were conducted during proficiency panel tests during the selection process.

Ultimately, defendant concluded, following the filing of this lawsuit, that neither ViroMed nor CDD complied with the solicitation's mandatory requirement to submit a certification indicating that the offeror conducted the proficiency panel tests in the precise manner proposed for contract performance. Defendant contends that the solicitation requirement to submit a single certification document is clear and explicit. The defendant now asserts that, in fact, neither CDD nor ViroMed properly certified because neither presented a single signed document stating that the proficiency panel testing was performed in the precise manner the offeror will employ during contract performance. Given that all offerors in the competitive range failed to comply with the solicitation, during the course of the proceedings before this court, the defendant requested that the case be remanded to MEDCOM for further corrective action. Defendant cites the United States Supreme Court decision in *Florida Power & Light*, which states that:

If the record before the agency does not support the agency action, *if the agency has not considered all relevant factors,* or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.

*Florida Power & Light v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) (emphasis added by defendant). The defendant argues that plaintiff ViroMed should not be awarded the contract because ViroMed also did not comply with the solicitation's requirement to submit a certification.

At this point, the intervenor and contract awardee, CDD, agrees with the defendant and concedes that it did not submit the certification required by the solicitation. CDD also contends that ViroMed's laboratory worksheets and DD Form 250 do not contain any language that MEDCOM could ever rely on to hold ViroMed to performing the contract in the same manner in which it performed the proficiency panel tests. CDD also requests that the case be remanded and states that it is ready and willing to submit a "precise manner" certification to the contracting officer.

Absent the certification in the "precise manner" required by the solicitation, the award to CDD cannot stand, and ViroMed, similarly, cannot be awarded the MEDCOM contract. *See ManTech Telecomms. and Info. Sys. Corp. v. United States,* 49 Fed.Cl. 57, 71 (2001) (noncompliant proposals cannot form the basis of an award). Fortunately, during the time of all the GAO and court challenges, as well as the time necessary to take corrective actions, the required services were being made available to MEDCOM. Defendant has requested the court to remand the procurement to MEDCOM for further action. Defendant has proposed options for corrective action in this case, including (1) amendment of the solicitation to remove the requirement for a "precise manner" certification; (2) retention of the "precise manner" certification requirement, but amendment of the solicitation to reopen discussions with ViroMed and CDD and to permit submission

of new proficiency test results and certifications; (3) option 2, but before discussions are reopened, amendment of the solicitation to define "precise manner"; and (4) cancellation and resolicitation of MEDCOM's requirements. The intervenor has proposed potential options similar to options (2) and (3) above. Neither defendant nor intervenor support the last option named, cancellation and resolicitation. Alternatively, plaintiff believes that options one, two and three may lead to an inevitable award of the contract to CDD, and plaintiff argues that, if the court finds, as the court has, that ViroMed did not meet the "precise manner" certification requirement, the only reasonable option is the fourth option, the cancellation and resolicitation of MEDCOM's requirements.

As for ViroMed's concerns that CDD will emerge the awardee from defendant's amendment of the solicitation, rather than resolicitation, the court in *ManTech* addressed similar concerns by the protestor (ManTech) that another offeror (Lockheed Martin) would be able to cure deficiencies in its proposal stemming from revisions to the solicitation by the Army:

> In the court's view, the concerns raised by ManTech are subsumed and fully addressed in the context of the standard the courts have employee in reviewing proposed amendments, *to wit*, is the action taken "in good faith, without the specific intent of changing a particular offeror's technical ranking or avoiding an award to a particular offeror." *Federal Sec. Sys. Inc.*, [B–281745.2, 99–1 CPD ¶ 86, at 5, 1999 WL 292729 (Comp.Gen.1999).] At the core of this standard are essentially the same types of fairness concerns that ManTech raises, in particular, the concern that an amendment not be used as a vehicle to steer a contract toward or away from a particular contractor. These fairness concerns are neither implicated nor offended to the extent such an amendment is designed, instead, merely to ensure that the United States receives the best possible value at the lowest cost—indeed, such is the essence of a best value procurement.

*ManTech Telecomms. and Info. Sys. Corp. v. United States*, 49 Fed. Cl. at 75 (footnote omitted).

Had ViroMed properly submitted a "precise manner" certification and CDD failed to submit the same certification required by the solicitation, and if MEDCOM under such facts deleted the certification requirement and awarded to CDD, the court would be concerned with whether or not the procurement process and award had been manipulated for the benefit of CDD. *See Seaborn Health Care v. United States*, 55 Fed.Cl. 520, 527 (2003) (citing *ManTech Telecomms. and Info. Sys. Corp. v. United States*, 49 Fed.Cl. at 73, *see also id.* at 75, 77). In the present case, however, as discussed above, neither ViroMed nor CDD submitted the required "precise manner" certification. Nevertheless, the certification is a significant element of the solicitation, sufficiently significant to cause the award to CDD to be vacated, and for the procurement to be remanded to a MEDCOM contracting officer for some sort of further action on the continuing requirement for testing services. As defendant suggests, the procurement of government requirements is best left to the agency. *See ManTech Telecomms. and Info. Sys. Corp. v. United States*, 49 Fed.Cl. at 73 ("Thus, as a general rule, in a negotiated procurement, the contracting agency has broad discretion to amend the solicitation when it determines that such action is necessary to ensure fair and impartial competition and to permit the government to obtain its minimum requirements at the most favorable price.") However, to simply delete the certification requirement and award to CDD would appear to cast a shadow over MEDCOM's procurement. Offerors made their proposals pursuant to a solicitation containing the certification requirement. The number of offerors might have been impacted had the solicitation not contained the solicitation requirement in the first place. The concept of certifying that contract testing shall be conducted in the precise manner in which proficiency testing was conducted is a reasonable one given the nature of the procurement. ViroMed suggests, and the court agrees, that the absence of a certification requirement may have created a different competitive scenario and a different competition. On re-

mand to MEDCOM, if the agency determines to cancel and resolicit, it may delete, or retain, or retain and clarify in the new solicitation the requirement of a "precise manner" certification, thereby creating a somewhat different competitive scenario. However, if the agency determines to retain the present competition, defendant's option one above, simply removing the "precise manner" certification requirement, under the present facts, would be problematic.

## CONCLUSION

Neither ViroMed nor CDD accompanied their proficiency panel test results with a certification, signed by a laboratory supervisor, certifying that the administration of the prescribed tests were accomplished in the precise manner that the offeror would employ in the performance of the contract, as required by the solicitation. Therefore, the contract award to CDD is **VACATED**, with instructions to the defendant to conduct a fair and proper procurement process, consistent with this opinion, if there remains a continuing requirement for testing services at MEDCOM. The plaintiff's complaint is **DISMISSED**, with prejudice. Each party shall bear its own costs. The clerk's office shall enter **JUDGMENT** consistent with this opinion.

**IT IS SO ORDERED.**

