PHT SUPPLY CORPORATION, Plaintiff,

v.

The UNITED STATES, Defendant,

Airtronic Services, Inc., Intervenor–
Defendant.

No. 05–1312 C.

United States Court of Federal Claims.

May 26, 2006.[1]

1. This opinion was issued under seal on March 31, 2006. Pursuant to ¶ 3 of the ordering language, the parties identified proprietary material subject to deletion on the basis that the material was protected/privileged. Brackets identify the material deleted.

Cyrus E. Phillips, IV, Washington, D.C., for plaintiff.

Kenneth Woodrow, United States Department of Justice, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Franklin E. White, Jr., Assistant Director, Washington, D.C., for defendant. James Mackey Ives, Army Litigation Division, Washington, D.C., of counsel.

Garry Grossman, with whom were Jeffrey S. Jacobovitz and Aaron M. Forester, Washington, D.C., for intervenor-defendant.

## OPINION

BUSH, Judge.

Plaintiff PHT Supply Corporation (PHT) filed its post-award bid protest complaint on December 16, 2005. The administrative record (AR) was filed on January 19, 2006. Now pending before the court are plaintiff's motion for judgment on the administrative record, filed January 24, 2006, and cross-motions for judgment on the administrative record filed by defendant the United States (United States) and intervenor-defendant Airtronic Services, Inc. (Airtronic) on February 8, 2006. The motions have been fully briefed. PHT filed a response to the motions by defendant and intervenor-defendant on February 13, 2006, and Airtronic and the United States replied on February 24, 2006. Discovery was not requested by the parties and oral argument was not requested and deemed unnecessary. For the reasons that follow, the court denies plaintiff's motion for judgment on the administrative record, and grants the motions by the United States and Airtronic for judgment on the administrative record.

## BACKGROUND

### I. The Solicitation

On April 26, 2005, the United States, acting through the U.S. Army Tank–Automotive & Armaments Command, Rock Island Arsenal (TACOM–RI) in Rock Island, Illinois, issued Solicitation No. W52H09–04–R–0119, for the purchase of magazine cartridges to be used with M9 9 millimeter semiautomatic pistols. The contract was designated as a 100% small business set-aside. AR at 119. The solicitation sought competitive proposals from eligible businesses for a firm, fixed-price, five year Indefinite Delivery/Indefinite Quantity (ID/IQ) contract period. The solicitation also guaranteed that the contract would result in a minimum order of 900,000 units and a maximum order of 14,000,000 units. Further, award would be made to the offeror whose proposal offered the best overall value to the government, based on an integrated assessment of past performance and price. Past performance was described as "slightly more important" to the agency's decision.

So that TACOM–RI could adequately assess past performance, the solicitation required each offeror to submit certain information related to government and com-

mercial contracts awarded to that offeror during the previous three years. Section L of the document, entitled "INSTRUCTIONS TO OFFERORS," provided as follows:

5. Section 1—PAST PERFORMANCE

. . . . . . . . . . . . . . . . . . . . . . .

Contract References: The offeror shall submit with its initial proposal contract references representing its recent, relevant performance under Government and/or commercial contracts. The contractor shall submit no more than five (5) contract references.

"Recent" means any contract under which any performance, delivery, or corrective action has taken place within approximately the last 3 years of the issuance of this solicitation.

"Relevant" means performance on contracts with a contract value over $500,000 that demonstrates the offeror has successfully manufactured or provided M9 Magazine Cartridge or similar items. The following characteristics would be particularly relevant:

* Items that require high precision stamped metal components.

* Items that require expertise in design, operation and manufacture of progressive forming dies.

The following information is required with respect to each contract reference:

a. Contract number and award date

b. Item(s) and/or service(s) provided, including national stock number (NSN), product description, part number, if applicable

c. A brief explanation of the contract's relevance of the current procurement

d. Contract dollar value

e. Quantity and monthly delivery rate if applicable

f. Original performance schedule, actual performance dates

g. Describe technical innovations or engineering changes that improved the quality of performance aspects of the delivered product, or any significant achievements associated with contract performance

h. Buying activity or company, and mailing address

i. Point(s) of contact, including names, job titles, telephone and fax numbers, and email addresses

. . . . . . . . . . . . . . . . . . . . . . .

*Other Contracts:* In addition to the above contract references, the offeror shall identify every recent and relevant contract it was awarded that:

* experienced any delivery/performance delays;

* experienced any quality problems;

*and* every recent contract that was terminated, or cancelled for any reason, in whole or in part.

For any contract falling under the descriptions above, provide all of the information listed in the preceding paragraph, *plus:*

* List each time the delivery schedule was revised

* Provide an explanation of why the revision was necessary

* Provide a copy of any cure notices or show cause letters received

* Identify reason for any termination

* State any corrective actions taken to avoid recurrence

* Describe the extent to which the corrective action has been successful, identifying points of contact who can confirm the success of the corrective measures

* Describe in detail any quality or technical performance problems, including:

 * Rejection or failure of vendor parts

 * Internal/external customer complaints

 * FATR/first piece disapprovals/failures

 * Lot rejections

 * Audit findings classified as major

 * Quality deficiency reports

 * Warranty claims

The number of contract references provided in response to this paragraph is unlimited.

If there are no recent relevant contracts meeting the description above, the offeror must so state that.

AR at 164–65; DSOF ¶¶ 5–8. A Source Selection Plan which accompanied the solicitation required offerors to submit firm, fixed prices for each Ordering Period and Quantity Range, as well as for their proposed First Article Test cost. It further provided that all proposed prices would be treated as binding.

Section M of the solicitation, entitled "EVALUATION OF PROPOSALS," set forth the agency's method of evaluation. It stated, in relevant part,

2. The selection criteria is set forth as follows:

a. PAST PERFORMANCE:

Past performance information is evaluated as a predictor of future contract performance. Using past performance information for each offeror, the Government will assess the probability that the instant requirement will be successfully completed in accordance with contract terms.

In evaluating performance history, the Government may review the offeror's current and prior performance record of complying with all aspects of its contractual agreement: conformance to technical requirements; timeliness of deliveries/performance; quality of performance.

In conducting the past performance evaluation, the Government may use information obtained from other sources. The Government may consider the currency, degree of relevance, source and context of the past performance information it evaluates as well as general trends in performance, and demonstrated corrective actions.

A significant achievement, problem/problem resolution or lack of relevant data in any element can become an important consideration in the selection process.

A negative finding in any element may result in an overall high-risk rating.

The Government may also consider past performance information regarding predecessor companies, key personnel, other corporate entities or subcontractors where such information is relevant to this acquisition.

Offerors' past performance will be rated as follows:

Very Low Risk: Based on the offeror's past performance, very little doubt exists that the offeror will successfully perform the required effort.

Low Risk: Based on the offeror's past performance, little doubt exists that the offeror will successfully perform the required effort.

Moderate Risk: Based on the offeror's past performance, some doubt exists that the offeror will successfully perform the required effort.

High Risk: Based on the offeror's past performance, significant doubt exists that the offeror will successfully perform the required effort.

Unknown Risk: The offeror had little or no recent/relevant past performance upon which to base a meaningful performance risk prediction.

The Government is not required to interview all points of contact identified by offerors.

It is the responsibility of the offeror to provide complete past performance information and thorough explanations as required by Section L. The Government is not obliged to make another request for the required information.

AR at 169. The Source Selection Plan reiterated these aspects of the solicitation, including the evaluation scheme.

## II. The Proposal Evaluations

PHT, Airtronic, and three other small businesses submitted offers in response to the solicitation. After initial reviews, however, two were deemed ineligible for the award. Acting through its source selection authority (SSA) and contracting officer (CO), Marc E. Lemon (Lemon), as well as an eight member evaluation team, TACOM–RI then conducted a complete review of the proposals from the three remaining offerors. The agency's critiques of the proposals from PHT and Airtronic, which are at the heart of this litigation, are summarized below.

## A. Airtronic's Proposal

Airtronic submitted its initial proposal on May 26, 2005. Along with the required technical specifications and pricing information, the company submitted ten contract references as evidence of its past performance. These included a contract valued at $468,000, for the manufacture of top cover assemblies for .50 caliber machine guns; a contract valued at $439,000, for the manufacture of MK19 gun sights; one valued at $49,306, for the manufacture of M1 Abrams tank guard assemblies; and a group of six purchase orders, with an aggregate value of $255,075, for the manufacture of M242 machine gun sears and washers. Airtronic submitted no information related to contracts which had experienced performance problems, or were terminated or cancelled.

On June 22, 2005, three members of TACOM–RI's evaluation team conducted an initial past performance evaluation of Airtronic's proposal. The team found that none of the company's contract references were "relevant," as defined by the solicitation, because each was valued at less than $500,000, and because none required "high precision stamped metal components, or items requiring expertise in design, operation and manufacture of progressive forming dies." AR at 370. The team also noted that, at the time of the review, intervenor-defendant had three open government contracts, with five line items and no delinquencies, and had delivered eight contracts with ten line items in the previous twelve months. The team's investigation revealed that four of Airtronic's line items were delinquent, each for less than thirty days. The team further reported that

> [i]nternal government records indicate that Airtronics currently has [ ] active contracts with [ ] line items placed at TACOM Rock Island with [ ]. [ ]. The contractor has not yet submitted First Article for approval. The Quality Assurance Representative (QAR) reported a total of [ ] were issued. For [ ], it appears the contractor was not at fault. Additionally, [ ]. The investigation for each of those revealed that contractor personnel made a[ ].

*Id.* In addition, the report noted that "[t]he Past Performance Information Retrieval System (PPIRS–SR) rates this contractor's performance for Federal Stock Classification (FSC) of [ ] delivery records with [ ] rating. The FSC 1005 is relevant to the current solicitation." *Id.* The initial report concluded that "Airtronic Services merits a Moderate Risk: Based on the offeror's past performance, some doubt exists that the offeror will successfully perform the required effort." *Id.* at 387 (emphasis in original).

On July 12, 2005, the evaluation team opened discussions with Airtronic. By letter, the team informed intervenor-defendant that none of its contract references were "relevant," under the terms of the solicitation. The team then asked the company to provide all supplemental information, if any, related to its past contracts which did, in fact, meet the relevance definition; to address the preliminary findings related to its past performance; and to verify that "their proposed magazines would be in compliance to the dry film lubricant per SAE AS5272, type 1, which shall be applied to the plastic magazine follower." *Id.* at 211, 387–88. In response, Airtronic acknowledged that most of its references were relevant only to the extent that they demonstrated the company's complex machining ability and/or its ability to deliver on time. It did, however, contend that two contracts it had cited required manufacturing processes similar to those requested by the solicitation.

Airtronic also submitted two new contract references for review. The first, which had recently been awarded to Airtronic, was for the manufacture of bandolier adapters. Airtronic explained that the contract required complex stamping, that it had made early deliveries, and that the government had exercised several options to extend the contract. The second procurement, for the production of elliptical reflectors for EchoStar satellite dishes, was performed by Airtronic's stamping partner, Alpha Products of Chicago (Alpha), a company with "in-house tool designers and toolmakers." *Id.* at 236. The intervenor-defendant explained that, if successful in its bid to win the contract award, it intended to produce the M9 magazines by again partnering with Alpha. Airtronic also addressed TACOMRI's concerns about its

previous delinquencies, by representing that it had hired new employees, and thus increased production capacity, and had made changes to its organizational structure which would eliminate product quality deficiencies. Finally, Airtronic assured the agency that it was "completely familiar[ ]" with the "issues with the Magazine" which required use of the dry film lubricant. AR at 235, 241; DSOF ¶ 21; IPAF ¶ 4.

In a final past performance evaluation dated July 19, 2005, the evaluation team noted those explanations by Airtronic, and concluded that

> [a] review of the information requested during discussions and Airtronic's responses determine that the four contracts cited . . . contained stamped metal components, but none met the $500,000 contract value as required by Section L of the solicitation. Therefore, were not considered in the evaluation. On the Alpha contract . . . it is unclear if Airtronics was a partner on this contract or if they are simply providing this reference for their subcontractor who might be a part of the proposal or plan for future awards for the M9Magazines. Airtronic Services responses determine[ ] that there were no changes and rating of Moderate risk that was established on 22 June 2005 remains unchanged. *The Final risk Rating is Moderate Risk. . . .*

AR at 376 (emphasis in original).

The SSA made his source selection determination on September 15, 2005. In his written report, the SSA noted that none of Airtronic's contract references were "relevant," as defined by the solicitation, inasmuch as each was valued at less than $500,000. The record shows, however, that the SSA considered them as "suitable for evaluation of general trends." AR at 211. The SSA also reviewed the external and internal government records cited by the evaluation team.[2] After reviewing Airtronic's finalized past performance information, the SSA concluded that

> Airtronic's contract references failed to meet the $500,000 threshold to be considered relevant, which might suggest the

offeror merits an Unknown Risk rating. In accessing [sic] the offeror's overall record, a moderate rating appears more appropriate. The *moderate risk* rating is based on general trends in performance. Based on the offeror's past performance, some doubt exists that the offeror will successfully perform the required effort.

AR at 212 (emphasis in original).

## B. PHT's Proposal

PHT, like Airtronic, submitted its initial proposal on May 26, 2005. Along with pricing data and technical specifications, plaintiff listed five contract references for the agency's review. Only one was held by PHT directly. That contract, valued at $422,500, was for the manufacture of [ ]. The four remaining contracts were held by [ ], an entity which plaintiff proposed to hire as a consultant on the TACOM–RI contract. [ ] first contract reference consisted of a number of purchase orders, with a total value of $1,500,000, for the manufacture of round magazines. *Id.* at 313. The second and third contract references were purchase orders valued at $15,950 and $30,000, respectively, for the manufacture of magazine tubes and "high standard magazines." *Id.* at 321–25. The final [ ] reference, another group of purchase orders with an aggregate value of $500,000, was for the production of assorted magazines for the Beretta 92 handgun. *Id.* at 319. PHT reported no information related to contracts which had experienced performance problems, were terminated, or were cancelled.

The TACOM–RI three-member evaluation team evaluated each of plaintiff's contract references in a report dated June 30, 2005. Regarding PHT's own contract reference, the team reported that

> [t]he [ ]contains circuit cards that have stamped metal components that are somewhat relevant to the solicitation. The Point of Contact (POC) reported the overall workmanship/quality was good and the items were shipped ahead of schedule. The offeror has been professional and their commitment to customer satisfaction has

---

2. The evaluation team's summary of those records is reproduced *supra.*

been good. No negative information was reported.

AR at 379. The first of [ ] contract references was not evaluated by the team, because they were unable to contact the POC listed in PHT's proposal. The purchase orders with values of $15,950 and $30,000 were also excluded from review because the purchase orders did not meet the solicitation's $500,000 contract value requirement. *Id.* However, with regard to [ ] final reference, the team reported as follows:

> The subcontractor stated that they have delivered approximately 50,000 pieces in the last three years with fewer than 500 pieces delivered late, none later than 60 days. Magazines were similar to the item in this solicitation. They also stated they had retooled dies to improve product. In a telephone interview, the Point of Contact (POC) reported [ ] performance ran "hot and cold." Their overall workmanship/quality was generally good. Some magazines were fine while some did not function properly. The POC added deliveries were slow.

*Id.* at 380. The team noted further that "[n]o other delivery or quality performance information could be located in either internal or external data searches or the Past Performance Information Retrieval System (PPIRS–SR) for FSC 1005 on this contractor." *Id.* It concluded that "PHT Corp merits a *High Risk*. . . ." *Id.* (emphasis in original).

As it had done with Airtronic, TACOM–RI opened discussions with PHT on July 12, 2005. By letter, the evaluation team informed plaintiff that one of the POCs it had listed for [ ] contract references had not responded to the agency's attempts at contact. The team also explained that PHT's own contract reference was not "relevant" because, although it involved the manufacture of items similar to the M9 magazine, the reference was valued at less than $500,000. *Id.* Plaintiff was asked to confirm that its proposed product would comply with the dry film lubricant requirement, and to comment on the criticisms by the POC regarding [ ] fourth contract reference. *Id.* at 389–90. In response to these queries, PHT altered its

offer slightly and proposed to subcontract with [ ] for the manufacture of the required items, in lieu of consulting with the company. *Id.* at 330. PHT also supplied new contact information for the reference on [ ]first contract. Regarding alleged problems with the quality of [ ] products, PHT offered the following explanation, as summarized by the SSA:

> PHT's explanation of [ ] magazines that did not function properly was that the government's pending ban on high-capacity magazines deterred [ ] management from investing in new dies to replace older dies that were beginning to wear. Some customers insisted on receiving this product before the ban would go into effect. Ultimately, the ban was removed, at which time [ ] did invest in new dies. In fact, [ ] initiated a *retooling process that involved switching to laser cutting die technology, which is vastly superior to the older technology and is a significant investment in quality. [ ] enhanced its redundant processes for continual monitoring of dies to detect wear before it impacts product quality. ([ ] has the ability to replace dies promptly with minimal disruption to production). [ ] replaced problem magazines expeditiously and at no cost to the customer. Interfacing of general business and accounting practices between [ ] and its customers contributed to delivery delays of otherwise timely available goods.

*Id.* at 215; *see also id.* at 331–32. PHT also confirmed that its product would comply with the dry film lubricant requirement. *Id.* at 331.

On July 20, 2005, the TACOM–RI evaluation team completed a final past performance evaluation of PHT's proposal. In doing so, it contacted PHT's new POC, which reported that

> [ ] workmanship/quality was overall good, but [there was] a high defective return rate on their magazines. They are late quite a bit of the time on shipping orders. The POC stated they are reasonable and cooperative in business relations and they try to satisfy their customers.

*Id.* at 386. Based on PHT's updated information, the team concluded that

PHT provided additional information during discussions, which included an explanation of why some of the magazines that [ ] delivered did not function properly. The rating of High risk that was established on 30 June 2005 is changed to Moderate Risk based on the offeror's response. *The Final risk Rating is Moderate Risk....*

*Id.* (emphasis in original).

In his source selection document, SSA Lemon considered the evaluation team's report. In reviewing PHT's contract reference, he noted that it was valued at only $422,500, and so, was not "relevant." However, as was the case with Airtronic, he did evaluate the reference "for general trends in performance." *Id.* at 214. The SSA also stated that because the Point of Contact (POC) listed along with [ ] first group of purchase orders could not be contacted, that reference initially had not been considered by the agency. The SSA went on to state, however, that the POC eventually responded to the agency's request for information, and he reiterated the POC's remarks. Further, the second and third references were also "considered relevant by considering general trends in performance," even though they "did not meet the $500,000 dollar contract value as specified in Section L of the solicitation." *Id.* Mr. Lemon also adopted the evaluation team's written remarks regarding the final set of purchase orders, and repeated them verbatim in his report.[3] *Id.* The SSA also noted that "[e]xternal and internal data searches of Past Performance Information Retrieval System (PPIRS–SR) for PHT Corporation, or [ ] for FSC 1005 for other delivery or quality performance information could not be located." *Id.* In accordance with the foregoing information, the SSA concluded

that PHT and [ ] had "raised their rating from a high risk to a *moderate risk.* Based on the offeror's past performance, some doubt exists that the offeror will successfully perform the required effort." *Id.* at 215 (emphasis in original).

### C. Price

The SSA also evaluated the prices proposed by each offeror. The record shows that both Airtronic and PHT increased their total contract prices during the course of discussions with TACOM–RI. Airtronic's final proposed price was [ ]. PHT's final price was [ ]. AR at 216. TACOM–RI's Contract Pricing Team conducted a comparison of the proposed prices under Federal Acquisition Regulation (FAR) § 15.404–1(b)(2)(i) and found that PHT's price was [ ] higher than Airtronic's. *Id.* at 344; 48 C.F.R. § 15.404–1(b)(2)(i) (2005). A historical price comparison revealed that Airtronic's proposed price was 26.5% lower than the historical adjusted price per unit.[4] *Id.* at 345. Both the Contract Pricing Team and the SSA noted that such a difference was to be expected, given the significant difference between the expected large quantities called for under the current solicitation, as opposed to previous, smaller ones.

In determining which proposal represented the best value to the government, the SSA issued the following "summary of the past performance risk and total evaluated price":

| Contractor | Past Performance | Price |
|---|---|---|
| Airtronic Services, Inc. | Moderate Risk | [ ] |
| PHT Corporation | Moderate Risk | [ ] |
| [ ] | Very Low Risk | [ ] |

*Id.* at 217; DSOF ¶ 30. Based on that summary and the underlying data, he made the following findings:

---

**3.** The evaluation team's report concerning that reference is reproduced *supra.*

**4.** The initial price analysis, conducted under the authority of FAR § 15.404–1(b)(2)(ii), was performed on June 21, 2005. AR at 337. On that date, Airtronic's proposed price was approximately [ ] lower than the historical adjusted price for the magazines. On August 31, 2005, a final price analysis revealed that, after Airtronic increased its price in response to the agency's request for verification, its proposed price was only [ ] lower than the historical adjusted price. *Id.* at 345. The SSA's report, however, errone-

ously listed the intervenor's price as [ ] less than the historical adjusted price. *Id.* at 216. The record does not reveal the cause of this discrepancy, nor have the parties addressed it in the briefing. This discrepancy would not, however, have altered the outcome of the SSA's decision, inasmuch as the actual difference between Airtronic's proposed price and the historical adjusted price was even less than the amount erroneously cited by the SSA and would have therefore mitigated even more in favor of award of the solicitation to Airtronic.

The evaluation factor of Performance Risk is slightly more important than price. Airtronic Services total evaluated price is the lowest of the three offerors received and they received a past performance rating of "moderate risk," ... Airtronic will be partnering with Alpha Products of Chicago, an ISO 9001:2000 facility to manufacture the magazine. Airtronic and Alpha Products have somewhat relevant experience in items that require complex stamped components. Although Airtronic has not produced the M9 Magazine, their partner's specialized service includes in-house tool designers and toolmakers that build progressive tools on the premises. They will create the necessary tooling in time for the FAT in 120 days after receipt of award. Airtronic Services, Inc. and PHT Corporations proposals both received performance ratings of "moderate risk." Both ratings represent that some doubt exists that the offeror will successfully perform the required effort. Airtronic proposed a lower price with the total evaluated price being [ ] lower than PHT Corporation estimated price. There is no significant advantage to the Government in an award to PHT Corporation, a company with a similar past performance rating (moderate risk) but a higher price than Airtronic. A higher total evaluated price does not warrant paying a premium for an award to PHT Corporation; therefore the best value to the government lies with an award to Airtronic Services, Inc.

AR at 217; IPAF ¶ 1.

### D. The Award

On September 15, 2005, TACOM–RI awarded Contract No. W52H09–05–D–0328 to Airtronic, based on its offer to supply the M9 magazine cartridges at a unit price of [ ]. On that same day, the SSA issued Delivery Order No. 0001, which directed Airtronic to produce the guaranteed minimum quantity of 900,000 units. The SSA also informed PHT,

by letter, that its proposal had been unsuccessful. On September 16, 2005, plaintiff requested and received a debriefing from the agency regarding the basis for contract award to Airtronic.

Ten days later, on September 26, 2005, PHT sent a letter to TACOM–RI, and to Robert Walter, Airtronic's Chief Executive Officer, which stated that "[w]e think that Airtronic has made a mistake, and that Airtronic cannot perform this Contract at the agreed price." Id. at 365. Plaintiff alleged further that "[g]iven its unit price of [ ], Airtronic cannot cover the cost of materials, mark-ups, and reasonable return on investment while at the same time complying with Contract requirements for dry film lubricant protective finish." [5] Id. On the next day, Mr. Walter telephoned TACOM–RI, and assured defendant that he had rechecked Airtronic's costs and that the proposed unit prices "were correct when proposed, and they are correct today." Id. at 366. No change to the award was made. On September 28, 2005, PHT filed a bid protest with the United States Government Accountability Office (GAO), arguing that the SSA had improperly assessed the past performance information from PHT and Airtronic, and had mistakenly concluded that Airtronic's proposal offered a better value to the government. GAO denied the protest on December 8, 2005.[6] AR at 113 et seq.

PHT filed its post-award bid protest in this court on December 16, 2005. Much like its arguments to GAO, plaintiff alleges here that the SSA's decision to award Contract No. W52H09–05–D–0328 to Airtronic was contrary to law because the SSA used factors not found in the solicitation to evaluate each offeror's past performance history. In the alternative, PHT argues that the award was unreasonable because it was based on incomplete information about Airtronic's past performance, and on an erroneous belief that an award to PHT would require the United States to pay a higher price for the magazine cartridges. Based on these alleged errors, PHT seeks a permanent injunction ordering

---

5. It is not clear why PHT quoted Airtronic's unit price as [ ], rather than [ ] as it is identified elsewhere in the record.

6. "Although GAO decisions are not binding on this Court, the Court recognizes GAO's long-standing expertise in the bid protest area and accords its decisions due regard." Gentex Corp. v. United States, 58 Fed.Cl. 634, 636 n. 3 (2003) (citing Integrated Bus. Solutions, Inc. v. United States, 58 Fed.Cl. 420 (2003) (citations omitted)).

TACOM–RI to terminate the award to Airtronic, and to make a new source selection in compliance with the terms of the solicitation. Plaintiff also seeks money damages and equitable relief for the government's alleged breach of the implied-in-fact contract to consider its proposal in good faith.

## DISCUSSION

### I. Jurisdiction

This is a post-award bid protest action. There is no question that the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 (ADRA), Pub.L. No. 104–320, §§ 12(a), 12(b), 110 Stat. 3870, 3874–75, provides the United States Court of Federal Claims with post-award bid protest jurisdiction in actions filed after December 31, 1996. 28 U.S.C. § 1491(b)(1)-(4) (2000); *Asia Pac. Airlines v. United States*, 68 Fed.Cl. 8, 16 (2005); *ViroMed Labs., Inc. v. United States*, 62 Fed.Cl. 206, 211 (2004); *see also Am. Fed'n of Gov't Employees, AFL–CIO v. United States*, 258 F.3d 1294, 1300 (Fed.Cir.2001); *Hunt Bldg. Co. v. United States*, 61 Fed.Cl. 243, 268–69 (2004). The statute explicitly provides that this court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *see Asia Pacific*, 68 Fed.Cl. at 16; *Hunt Building*, 61 Fed.Cl. at 269 (both quoting 28 U.S.C. § 1491(b)(1)). "This statute further provides that the Court of Federal Claims 'shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.'" *Asia Pacific*, 68 Fed.Cl. at 16 (quoting 28 U.S.C. § 1491(b)(1)). Accordingly, this court has subject matter jurisdiction to adjudicate PHT's post-award bid protest. *See id.*

### II. Standard of Review

#### A. Judgment on the Administrative Record

PHT has filed a motion for judgment on the administrative record, under Rule 56.1 of the Rules of the United States Court of Federal Claims (RCFC).[7] The standard for evaluating such a motion is similar, but not identical, to that used to decide a motion for summary judgment under RCFC 56. *Hawkins v. United States*, 68 Fed.Cl. 74, 81 (2005) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355 (Fed.Cir.2005)). It is beyond cavil that, on a traditional motion for summary judgment, the court must inquire whether the moving party has proved its case as a matter of fact and law, or whether a genuine issue of material fact precludes judgment. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A Rule 56.1 motion, by contrast, calls for a more narrow review of whether, given the disputed and undisputed facts, the plaintiff has met its burden to show that a challenged decision was not in accordance with the law. *Id.; see also Bannum*, 404 F.3d at 1357 (instructing the court to make "factual findings under RCFC 56.1 from the [limited] record evidence as if it were conducting a trial on the record"). "[T]wo principles commonly associated with summary judgment motions-that the existence of a genuine issue of material fact precludes a grant of summary judgment and that inferences be weighed in favor of the non-moving party ... are inapplicable to a motion for judgment on the administrative record under RCFC 56.1." *Int'l Outsourcing Servs., L.L. C. v. United States*, 69 Fed. Cl. 40, 45 (2005) (citing *Bannum*, 404 F.3d at 1356–57). In other words,

> under RCFC 56.1, the existence of a fact question neither precludes the granting of a motion for judgment nor requires this court to conduct a full blown evidentiary proceeding. Rather, such fact questions must be resolved by reference to the administrative record, as properly supplemented—in the words of the Federal Circuit, "as if [this court] were conducting a trial on [that] record."

*Id.* (*quoting Bannum*, 404 F.3d at 1357); *see also Carlisle v. United States*, 66 Fed.Cl. 627, 630–31 (2005); *Doe v. United States*, 66 Fed. Cl. 165, 174 (2005).

---

7. RCFC 56.1 is titled "Review of Decision on the      Basis of Administrative Record."

## B. Bid Protest Review

It is well-settled that "this court's review of an agency's decision regarding a contractual solicitation or award takes place in accord with standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706." *Asia Pacific*, 68 Fed.Cl. at 19; *ViroMed Laboratories*, 62 Fed.Cl. at 211; *see also* 28 U.S.C. § 1491(b)(4) (2000) ("In any action under this [bid protest] subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *Bannum*, 404 F.3d at 1351 (stating that "the trial court [first] determines whether ... the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A)"). Accordingly, the court must determine whether the contracting agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A) (2000); *Bannum*, 404 F.3d at 1351; *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed.Cir.2000) ("The § 706(2)(A) 'arbitrary and capricious' standard applies to bid protests under 28 U.S.C. § 1491(b)(4) reviewed in the absence of [an agency-level appellate] hearing."). The plaintiff bears the burden of proving the arbitrary and capricious nature of the award, by a preponderance of the evidence. *See Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 995 (Fed. Cir.1996); *Hunt Building*, 61 Fed.Cl. at 269. "Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts." *ViroMed Laboratories*, 62 Fed.Cl. at 212 (citing *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). The court should overturn the challenged decision "only where '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed.Cir.2004); *Asia Pacific*, 68 Fed.Cl. at 19 (both quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332

(Fed.Cir.2001)); *see also Hunt Building*, 61 Fed.Cl. at 269. Essentially,

[w]hen a challenge is brought on the first ground, the test is whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a "heavy burden" of showing that the award decision had no rational basis. When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations.

*Banknote*, 365 F.3d at 1351 (internal quotations and citations omitted). It is critical to note that "a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a 'best-value' procurement." *Banknote Corp. of Am. v. United States*, 56 Fed.Cl. 377, 380 (2003); *see also LaBarge Prods., Inc. v. West*, 46 F.3d 1547, 1555 (Fed.Cir. 1995); *JWK Int'l Corp. v. United States*, 49 Fed.Cl. 371, 388 (2001). "And in cases such as this, when a negotiated procurement is involved and at issue is a performance evaluation, the greatest deference possible is given to the agency—what our Court has called a 'triple whammy of deference.'" *Gulf Group Inc. v. United States*, 61 Fed.Cl. 338, 351 (2004) (quoting *Overstreet Elec. Co. v. United States*, 59 Fed.Cl. 99, 117 (2003) (characterizing the standard of review as "near draconian")).

If it is determined that a contract was awarded in violation of APA standards, the court must then evaluate whether the plaintiff, as an unsuccessful bidder, was prejudiced significantly by the government's conduct. *Bannum*, 404 F.3d at 1353. To do so, the court is required "to make factual findings [under RCFC 56.1] from the record evidence as if it were conducting a trial on the record." *Id.* at 1357. Plaintiff again bears the burden of proof, and "must show that there was a substantial chance [plaintiff] would have received the contract award but for the [government's] errors...." *Id.* (internal quotations omitted).

## C. Permanent Injunction

In its complaint, PHT seeks a permanent injunction ordering TACOM–RI to vacate the award to Airtronic, and to re-award the contract in a manner which complies with the terms of the solicitation. "In deciding whether a permanent injunction should issue, a court considers: (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States,* 389 F.3d 1219, 1228–29 (Fed.Cir.2004) (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)); *KSEND v. United States,* 69 Fed.Cl. 103, 113 (2005). "The test for a permanent injunction is almost identical to that for a temporary restraining order or preliminary injunction, but rather than the likelihood of success on the merits, a permanent injunction requires actual success on the merits." *KSEND,* 69 Fed.Cl. at 113.

## III. Merits

### A. Whether the Award Violated 10 U.S.C. § 2305 and 48 C.F.R. § 15.303

Plaintiff argues first that the award to Airtronic violated 10 U.S.C. § 2305(b)(1) (2000). This federal statute provides that, in negotiated procurements, agencies "shall evaluate ... competitive proposals and make an award based solely on the factors specified in the solicitation." *Id.* PHT contends that here, the SSA's award decision was not made in accordance with the terms of Solicitation No. W52H09–04–R–0119. As plaintiff correctly points out, the solicitation required each offeror to provide information about its recent, relevant government and commercial contracts. AR at 164–65. It further provided that offerors with "little or no recent/relevant past performance" would be assigned an Adjectival Risk Assessment (ARA) of "Unknown Risk." *Id.* at 169. PHT argues that although Airtronic submitted absolutely no relevant contract references as evidence of its past performance, and indeed had none

which it could have submitted, the SSA nevertheless assigned an ARA of "Moderate Risk" to Airtronic. Plaintiff alleges that this choice constituted an unlawful divergence from the terms of the solicitation and that Airtronic should have received a rating of "unknown risk" instead. Plaintiff asserts that "[t]he Solicitation does not allow an adjectival Risk Assessment of 'Moderate Risk' upon 'accessing [sic] the offeror's overall record,'" and that this purported error "enabled Airtronic to unlawfully win the Award." Pl.'s Mot. at 18 (quoting AR at 212). In conjunction with this claim, PHT contends that the SSA failed to determine "which of the Competitive Proposals from Offerors with 'Relevant' Past Performances [was] 'most advantageous to the United States,'" as required by 10 U.S.C. § 2305(b)(4)(c) (2000), and which one presented the "best value," under 48 C.F.R. § 15.303(b)(6) (2005). Pl.'s Mot. at 18.

In response, defendant and intervenor-defendant insist that the SSA acted within his discretion when he assigned to Airtronic an ARA of "Moderate Risk," based on all of the evidence relevant to Airtronic's past performance. Airtronic argues that PHT has an incorrect and incomplete understanding of the solicitation, which the intervenor-defendant contends allowed the agency to "consider more than simply Contract References in its past performance/risk analysis" and "did not require TACOM–RI to give an offeror an 'unknown risk' rating if it did not submit Contract References." Int.'s Mot. at 3, 14. Airtronic contends that

> PHT's argument ... conflates relevant Contract References, of which Airtronic admittedly has none, with relevant past performance, and ... ignores specific language in the Solicitation which allows for the consideration of information beyond "relevant" past performance.

*Id.* at 14. Intervenor-defendant argues that its past contracts, while not "relevant," as defined by the solicitation, "were considered suitable for evaluation of general trends," as demonstrated by the SSA's statement that the rating was "based on the general trends in Airtronic's performance on otherwise relevant contracts and few delinquencies or qual-

ity problems." *Id.* at 4, 15. Airtronic further claims that the evidence of its past performance supports the SSA's conclusion that its proposal presented only a moderate risk. Intervenor-defendant also argues that it received no disparate treatment in the formulation of ARA ratings. *Id.* at 17 (distinguishing *Transatlantic Lines LLC v. United States*, 68 Fed.Cl. 48 (2005)). Airtronic points out that, even assuming that the SSA relaxed the solicitation's requirements, a similarly broad examination of PHT's past performance history was used to derive *its* ARA. *Id.* (citing AR at 379). In support of that contention, Airtronic highlights the SSA's review of a PHT contract valued at only $422,500, and two [ ] purchase orders valued at $30,000 or less.

In the alternative, intervenor-defendant argues that, even if its ARA was erroneous, and even if it should have received a rating of "unknown risk," PHT's claim fails nonetheless, because plaintiff has not demonstrated prejudice as a result of that error. Airtronic insists that, had the SSA's review been limited to relevant contract references, PHT's rating would also have been lower, and that, even with such changes, the vast price differential between the proposals would still justify the current award. Intervenor-defendant underscores the SSA's statement, in response to the GAO protest, that even with an ARA of "Unknown Risk," Airtronic would have won the contract.

The United States' arguments in response to this claim are similar. Defendant contends that the SSA acted within his discretion and that

> [f]undamentally, it is critical to recognize that the solicitation does not, in any way, *limit* what may be considered in evaluating an offeror's past performance.... The solicitation clearly states ... that the agency would consider information other than the specific contract references supplied by each offeror in evaluating the offeror's past performance history.

Def.'s Mot. at 10 (emphasis in original). The government states: "[r]equiring that an offeror supply contract references meeting certain criteria is vastly different from stating that the agency will consider *only* those con-

tracts in making its decision." *Id.* (emphasis in original). The United States cites a decision from the Comptroller General, *Bank St. Coll. of Educ.*, 63 Comp. Gen. 393, B–213209, 84–1 CPD ¶ 607, 1984 WL 46203 (1984), for the proposition that the evaluation of a factor may include all matters which are "logically encompassed by or related to the stated criteria." *Id.* at 11. Defendant further echoes Airtronic's argument that the SSA did not relax the solicitation requirements in favor of intervenor-defendant, but applied them equally, noting that, in evaluating PHT's past performance, the SSA looked outside of its few relevant and recent contract references, as well.

Plaintiff is correct that, in conducting solicitations such as this one, an award must be "based solely on the factors specified in the solicitation." 10 U.S.C. § 2305(b)(1); *JWK Int'l*, 49 Fed.Cl. at 389. Indeed, "[i]t is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation." *Banknote*, 56 Fed.Cl. at 386. Every solicitation must identify the evaluation factors and significant subfactors which will be used to evaluate proposals, as well as the relative importance of each factor and subfactor. *Gentex Corp. v. United States*, 58 Fed.Cl. 634, 652 (2003) (citing 41 U.S.C. § 253a(b)(1); FAR 15.304(d)). This is critical because "making offerors aware of the rules of the game in which they seek to participate is fundamental to fairness and open competition." *Id.* (quoting *Dubinsky v. United States*, 43 Fed.Cl. 243, 259 (1999)). As this court recently explained,

> [i]t ... is beyond peradventure that the government may not rely upon undisclosed evaluation criteria in evaluating proposals, and, where appropriate, must disclose the factors' relative importance.

*Banknote*, 56 Fed.Cl. at 386 (internal citations omitted). It is important to note, however, that a solicitation is not required to identify each element which will be considered by the agency, "where such element is intrinsic to the stated factors." *Id.* at 387 (quoting *Analytical & Research Tech., Inc. v. United States*, 39 Fed.Cl. 34, 45 (1997)). Moreover, the FAR vest contracting officers

with considerable discretion in evaluating an offeror's past performance. *Banknote*, 365 F.3d at 1355; *Banknote*, 56 Fed.Cl. at 386 (noting that agencies have "great discretion in determining the scope of an evaluation factor") (internal quotations omitted). FAR § 15.305(a), for example, provides that "[a]n agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation," but also explains that

> [t]he solicitation shall describe the approach for evaluating past performance, including evaluating offerors with no relevant performance history, and shall provide offerors an opportunity to identify past or current contracts ... for efforts similar to the Government requirement. The solicitation shall also authorize offerors to provide information on problems encountered on the identified contracts and the offeror corrective actions. The Government shall consider this information, as well as information obtained from any other sources, when evaluating the offeror past performance. *The source selection authority shall determine the relevance of similar past performance information.*

48 C.F.R. § 15.305(a)(2)(ii) (2005) (emphasis added). To succeed in a bid protest which challenges a negotiated procurement, a plaintiff must demonstrate that "(i) the procuring agency used a significantly different basis in evaluating the proposals than was disclosed; and (ii) the protester was prejudiced as a result—that it had a substantial chance to receive the contract award but for that error." *Banknote*, 56 Fed.Cl. at 387. Further, in reviewing an agency award, the court must recognize that "the determination of the relative merits of proposals is the responsibility of the procuring agency since it must bear the burden of any difficulties incurred by reason of a defective evaluation." *Id.* at 381 (quoting *Biological Monitoring, Inc.*, Comp. Gen. Dec., B–209432, 83–1 CPD ¶ 395, 1983 WL 26711 (1983)). Accordingly, in a bid protest which challenges an agency's evaluation of technical proposals or past performance, "review ... should be limited to determining whether the evaluation was reasonable, consistent with the stated evaluation

criteria and complied with relevant statutory and regulatory requirements." *Id.*

█ Here, plaintiff insists that the SSA used factors not specified by the solicitation to arrive at his award decision. The court agrees with the parties' contention that the success or failure of that claim hinges on the proper interpretation of Sections L and M of the solicitation. It is well settled that the task of construing the terms of a government solicitation essentially involves contract interpretation and therefore presents issues of law to be determined by the court. *Grumman Data Sys.*, 88 F.3d at 997; *Overstreet Elec.*, 59 Fed.Cl. at 112 ("The interpretation of a solicitation is not a matter of *post hoc* subjective opinion but is an objective question of law."); *Banknote*, 56 Fed.Cl. at 389 (same). Indeed, the principles which govern contract interpretation apply with equal force to the interpretation of government issued solicitations. *See Banknote*, 365 F.3d at 1353 n. 4 (citing *Grumman Data Sys.*, 88 F.3d at 997–98). Accordingly, the court's starting point is the plain language of the solicitation at issue. *Id.* at 1353. If the solicitation's language is clear and unambiguous, the court must give the language its "plain and ordinary meaning," and may not rely on extrinsic evidence to aid in its interpretation. *Id.* (internal citations omitted); *see also Overstreet Elec.*, 59 Fed.Cl. at 112. Further, the court must "consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." *Banknote*, 365 F.3d at 1353; *Overstreet Elec.*, 59 Fed.Cl. at 112 (citing *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985)).

PHT's principal contention is that Solicitation Number W52H09–04–R–0119 unambiguously provides that only "relevant" past performances will be evaluated, and that the SSA erred by considering other types of information. Plaintiff has not, however, cited a specific section of the solicitation, or any part of the administrative record, to support that assertion. It is true that, under the solicitation, the SSA was required to assess the probability that each offeror would perform the contract successfully, by using past performance information. The source selec-

tion plan, under the section entitled "Evaluation of Criteria/Procedures," in turn defined "past performance" as follows:

> Past performance information is relevant information regarding a contractor's actions under current or past awarded contracts over $500,000 that demonstrates the offeror has successfully manufactured or provided M9 Magazine Cartridge or similar items.

AR at 197. Additionally, Section L (Instructions to Offerors) of the solicitation explicitly required each offeror to submit information related to "recent" and "relevant" contract references for consideration by the SSA. *See id.* at 164. Read in isolation, those two clauses do appear to support plaintiff's contention that the SSA was limited to an examination of recent, relevant contract references to derive each offeror's ARA. Indeed, were these two provisions considered in isolation, they might appear to preclude consideration of other types of data. *See id.* To properly interpret the solicitation, however, the court must examine those clauses in context, *Banknote*, 365 F.3d at 1353, and in this instance, Section M of the solicitation requires the opposite outcome. SECTION M—EVALUATION OF PROPOSALS, provides, in pertinent part, as follows:

> a. Past Performance
>
> Past performance information is evaluated as a predictor of future contract performance. Using past performance information for each offeror, the Government will assess the probability that the instant requirement will be successfully completed in accordance with contract terms.
>
> In evaluating performance history, the Government may review the offeror's current and prior performance record of complying with all aspects of its contractual agreement: conformance to technical requirements; timeliness of deliveries/performance; quality of performance.
>
> In conducting the past performance evaluation, the Government may use information obtained from other sources. The Government may consider the currency,

degree of relevance, source and context of the past information it evaluates as well as general trends in performance, and demonstrated corrective actions.

. . . . . . . . . . . . . . . . . . . . . . .

The Government may also consider past performance information regarding predecessor companies, key personnel, other corporate entities or subcontractors where such information is relevant to this acquisition.

AR at 169.

Section M, which sets forth the methodology for evaluation of proposals, made it clear that a broad range of information would be considered by the SSA, including information collected from "other sources." *See id.* In fact, this provision states explicitly that, in order to evaluate proposals, the SSA was required to review each offeror's "performance history," including "the offeror's current and prior performance record of complying with all aspects of its contractual agreement"; "conformance to technical requirements"; "timeliness of deliveries/performance"; and "quality of performance," *as well as* "general trends in performance." *Id.* Section M likewise directs that, in evaluating proposal information, the SSA was to determine its "degree of relevance." [8] *Id.* In view of the solicitation's clear instructions to consider general trends of performance, and to determine an item's degree of relevance, plaintiff has failed to demonstrate that the SSA's review of past performance was limited to an examination of technically "relevant" contract references. The court agrees with Airtronic that PHT's interpretation of Section M would read that clause out of the solicitation. Based on the solicitation's unambiguous language, the court concludes that the SSA acted within his discretion when he included non-relevant contracts as a part of his examination of general trends in the offerors' past performance.

Plaintiff's argument fails for other reasons, as well. First, the court agrees with defen-

---

8. Those clauses mirror provisions of the FAR, which explicitly require contracting officers to consider past performance information obtained from sources independent of an offeror's proposal, and to determine its relevance. *See* 48 C.F.R. § 15.305(a)(2)(ii).

dant and Airtronic that, on this record, PHT's claim that the SSA failed to evenly apply a mandatory provision of the solicitation is deficient. There is no question that, even if the SSA's interpretation of the solicitation was overly broad, he applied that interpretation to each proposal equally. *See* AR at 213; *cf. Beta Analytics Int'l, Inc. v. United States,* 44 Fed.Cl. 131 (1999) (holding that award was illegal where government permitted awardee to change technical specifications of contract, but did not afford same opportunity to plaintiff). In his written evaluation, the SSA explicitly stated that he had considered PHT's own contract reference, which was valued at $422,500 and was thus not "relevant" under Section L of the solicitation, but which he included for general trends in performance. AR at 214. The SSA also considered two contract references submitted by plaintiff to demonstrate [ ] past performance, despite the fact that these contract references did not meet the $500,000 contract value specified in Section L of the solicitation. It is clear, therefore, that the SSA considered non-relevant contracts in his effort to evaluate PHT's past performance history, as well.

Nor can the court conclude that the ARA assigned to Airtronic lacked a rational basis. Indeed, the record supports the SSA's determination that there was a "Moderate Risk" that intervenor-defendant would fail to perform successfully. The evidence shows, for example, that at the time of the review, Airtronic held [ ] government contracts with [ ] line items and no delinquencies. In the previous twelve months, Airtronic had held [ ] government contracts and had delivered [ ] line items, with only [ ] delinquencies, none of which exceeded thirty days. AR at 368. Further, the company held [ ] active contracts with TACOM–RI, with [ ] line items and only [ ] contractor-caused delinquency, and although it had some previous product quality problems, Airtronic had taken concrete steps to address them. *Id.* at 237–38, 371. In addition, the Past Performance Information Retrieval System (PPIRS–SR) had rated Airtronic's past performance at [ ], on [ ] delivery records. *See id.* at 211. Finally, Airtronic submitted a number of contracts which demonstrated its complex stamping and machining ability, and it provided adequate explanations for the delays in its previous deliveries. *Id.* at 212. Thus, although PHT contends that contractors with "little or no recent/relevant past performance" were to be assigned an ARA of "Unknown Risk," plaintiff has not shown that Airtronic's performance history warranted such a rating.

Finally, and perhaps most importantly, PHT has presented no evidence that, but for the purported error, PHT itself would have had a "substantial chance" to win the award. *See Bannum,* 404 F.3d at 1353. Because Airtronic's proposed price was less than half of that submitted by PHT, an award to Airtronic likely would have been rational, even if the intervenor-defendant had received an ARA of "Unknown Risk." Without concrete evidence to the contrary, the court must conclude that the SSA acted within his discretion in awarding the contract to Airtronic, based, in no small measure, on such a marked savings to the government. This is especially true given the "triple whammy of deference" which must be afforded to the SSA's decisions on such matters. *Gulf Group,* 61 Fed.Cl. at 351.

For all of these reasons, the court cannot conclude that SSA Lemon's award decision was contrary to the law set out in 10 U.S.C. § 2305(b)(1), 2305(b)(4)(c), or 48 C.F.R. § 15.303(b)(6), or that it was otherwise arbitrary, capricious, or an abuse of discretion.

## B. Failure to Consider Past Contracts

■ PHT argues next that the award to Airtronic was unreasonable and should be overturned because it was based on incomplete information. Plaintiff claims, specifically, that although the solicitation required each offeror to provide information related to all of its recent contracts that were terminated or cancelled for any reason, Airtronic omitted such information from its proposal. PHT contends that Airtronic held Contract No. [ ] (Contract No. [ ]) and Contract No. [ ] (Contract No. [ ]) prior to submitting its offer, and that both were terminated, but that Airtronic failed to disclose that information

to TACOM–RI.[9] Plaintiff insists further that the SSA was aware of the omission, but wrongfully failed to penalize Airtronic for it, or to consider the import of the omitted information. In essence, PHT argues that it was unreasonable for the SSA to award the contract to Airtronic given its failure to comply with the solicitation's disclosure requirements, and that the ARA of "Moderate Risk" which he assigned to Airtronic was arbitrary and capricious, given the import of the omitted data.

In response, Airtronic argues that, under the express terms of the solicitation, it was not required to include information related to Contract No. [ ] or Contract No. [ ] in its proposal. As intervenor-defendant points out, the solicitation required disclosure of *recent* contracts that had been terminated or cancelled for any reason. *See* AR at 165 (emphasis added). "Recent" was defined as "any contract under which any performance, delivery, or corrective action has taken place within approximately the last 3 years of the issuance of this solicitation." *Id.* at 164. Airtronic reports that both of these contracts were terminated for the convenience of the government, before any performance, delivery, or corrective action occurred, and so, no obligation to disclose them arose.[10] Intervenor-defendant argues further that PHT has shown no prejudice as a result of the SSA's purported failure to consider these contracts. Relying on a statement from SSA Lemon, Airtronic insists that, even if they had been disclosed, Airtronic's ARA would not have changed, and PHT would not have had a substantial chance of winning the contract. Int.'s Mot. at 21–22 (citing AR at 4–5). Intervenor-defendant asserts that, even if its ARA were lowered, PHT "has ... not explained why such a rating would be sufficient to overcome the great cost savings to the government provided by Airtronic's proposal." *Id.* at 23.

The United States agrees with Airtronic that disclosure of the challenged contracts was not required, because no performance, delivery or corrective action occurred in relation to these contracts, and so, they were not "recent." Defendant also asserts that, even if the contracts were "recent," and should have been included, the omission was harmless. The government states that, "[b]ecause both contracts were terminated prior to any performance, they offered no evidence of past performance history. Therefore, they had no bearing upon the contracting officer's evaluation of whether Airtronic could meet the requirements of timely performance and delivery." Def.'s Mot. at 14. Defendant urges the court to find that, because the contracts were terminated for the convenience of the government, they are not indicative of Airtronic's ability to timely perform and deliver the product at issue here.

This claim, much like the first, centers on a disagreement regarding the proper interpretation of the solicitation. There is no question that the solicitation calls for the disclosure of all *recent* contracts held by an offeror which were terminated or cancelled for any reason. It also clear that the term "recent" is defined as "any contract under which any performance, delivery or corrective action has taken place within approximately the last three years of the issuance" of the solicitation. AR at 164. Whether the contracts should have been disclosed, then, depends on whether Airtronic undertook any actual performance or delivery on them, or whether

---

9. Contract No. [ ] was awarded to Airtronic on [ ]. It required the company to produce and deliver [ ] to TACOM–RI. The contract was terminated for the convenience of the government, by mutual agreement of the parties, on [ ]. According to a declaration from SSA Lemon, the termination resulted from a[ ]. Contract No. [ ], for the production of [ ], was awarded to Airtronic on [ ], and terminated for the convenience of the government on [ ]. Mr. Lemon stated that the contract was terminated due to [ ].

10. In its complaint, PHT complains of Airtronic's alleged failure to disclose information related to Contract No. [ ], and three other contracts. In a motion to compel supplementation of the administrative record, however, plaintiff sought to introduce documents related to Contract No. [ ] and a new contract, Contract No. [ ], but not the other three cited in the complaint. It is not clear, therefore, whether PHT intends to challenge Airtronic's failure to disclose one, or all of these contracts. Because PHT's most recent filings solely address Contract No. [ ] and Contract No. [ ], the court assumes that it intends to pursue the claims in relation to those two contracts only.

any corrective action came about, before they were cancelled. There is no evidence in this record, however, which shows that any such activity occurred. To establish that performance took place on Contract No. [ ], plaintiff argues that "[a] contract that is cancelled 188 days after the date of its award and 10 days prior to its required delivery date is not a Contract under which there has been *no* performance. The language of Modification Number P0001 to this Contract confirms that it was not until Intervenor–Defendant began performance under Contract No. [ ] that Intervenor–Defendant recognized, [ ], that Intervenor–Defendant could not deliver...." [11] Plaintiff's Reply to Intervenor–Defendant's Opposition to Plaintiff's Motion to Compel Supplementation of the Administrative Record at 5. The language of the cited modification, however, does not support that assertion:

Airtronic Services Inc requested a no-cost cancellation of this contract, due to [ ] required for this contract. The cost of [ ]. Therefore this contract is totally cancelled.

*Id.* Ex. 3 at 2; AR at 449.

Contrary to PHT's claim, no part of the referenced modification states or even implies that Airtronic had begun to build the requested items. Nor has PHT cited any authority to support its apparent contention that contract performance should be deemed to have occurred, simply because several months had passed between the dates of award and cancellation. Plaintiff has likewise failed to introduce evidence or to even argue that termination for the convenience of the government constitutes a form of "corrective action," and this court does not deem it as such. The majority of opinions from this court which discuss corrective action uses the term to describe actions taken by agencies in response to meritorious bid protests. *See and compare Four Points by Sheraton v. United States,* 66 Fed.Cl. 776, 779 (2005) (stating that government took corrective action when it reevaluated proposals and made a new source selection in response

to a bid protest); *Consolidated Eng'g Servs., Inc. v. United States,* 64 Fed.Cl. 617, 627 (2005) (same); *ViroMed Laboratories,* 62 Fed.Cl. at 208 (stating that agency took corrective action when it amended its proposal ratings in response to bid protests); *Blue Dot Energy Co. v. United States,* 61 Fed.Cl. 548, 551 (2004) (stating that Air Force took corrective action when it cancelled a pre-solicitation and suspended a due date for proposals in response to a bid protest). There is no evidence, however, that Contract No. [ ] or Contract No. [ ] were terminated for the convenience of the government as a result of a successful protest, whether filed by Airtronic or any other party. Under these circumstances, these particular cancellations would not be deemed "corrective actions," as that term is explicated by those cases. Further, it is also clear that to the extent any corrective action did occur here, it was undertaken by the government, and not Airtronic. That fact is critical because, under the FAR, agencies engaged in the consideration of past performance information are required to evaluate *"offeror* corrective actions." 48 C.F.R. § 15.305(a)(2)(ii) (emphasis added); *see, e.g., SAI Indus. Corp. v. United States,* 60 Fed.Cl. 731, 736 (2004) (noting that, after agency discovered defects in product, agency issued a "Corrective Action Request" to contractor which required contractor to recalibrate equipment before further shipments would be accepted). It follows that, even if these terminations for convenience were technically corrective actions, they were not the sort of corrective actions for which the solicitation and the regulations contemplated disclosure. For these reasons, the court agrees with defendant and intervenor-defendant that, under the plain meaning of the solicitation, these contracts need not have been disclosed.

Moreover, the court agrees with the United States that, even if Airtronic had been required to disclose these contracts, its failure to do so was harmless. It is well settled that "[t]he government's right to terminate a

11. The court notes that PHT raised this argument only in Plaintiff's Reply to Intervenor–Defendant's Opposition to Plaintiff's Motion to Compel Supplementation of the Administrative Record. Plaintiff failed to make any argument

on this point in its briefing in the cross-motions for judgment on the administrative record. Further detracting from plaintiff's position is the fact that this argument is directed at Contract No. [ ], which is not mentioned in the complaint.

contract for convenience is broad." *Northrop Grumman Corp. v. United States,* 46 Fed.Cl. 622, 626 (2000). In fact, a contract may be terminated for convenience by the government any time it determines that to do so is in its best interests, so long as it does not abuse its discretion or act in bad faith. *See Krygoski Constr. Co. v. United States,* 94 F.3d 1537, 1541 (Fed.Cir.1996); *Northrop Grumman,* 46 Fed.Cl. at 627; *see also* 48 C.F.R. § 52.249–2 (2005). Indeed, both the denotative and connotative meanings of the phrase "termination for the convenience of the government" make clear that a contractual relationship has been halted by the government simply because it no longer desires to continue it.[12] 48 C.F.R. § 52.249–2. For that reason, there is nothing to be gleaned, in terms of past performance history, from the details surrounding a contract so terminated, in the absence of any performance, delivery or corrective actions which may have taken place. It follows that, even if the SSA had reviewed the termination of Contract No. [ ] or Contract No. [ ], Airtronic's ARA would not have changed. The court rejects plaintiff's contention that the agency's award decision was unreasonable simply because that determination was made without the benefit of such an evaluation.

It is true that, "[i]n negotiated procurements, a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." *E.W. Bliss Co. v. United States,* 77 F.3d 445, 448 (Fed.Cir. 1996) (internal quotations omitted); *see also Halter Marine, Inc. v. United States,* 56 Fed.Cl. 144, 163 (2003); *ManTech Telecomms. and Info. Sys. Corp. v. United States,* 49 Fed.Cl. 57, 71 (2001) (stating that a materially noncompliant proposal cannot form the basis for award). It is equally settled, however, that "[e]ffective contracting demands broad discretion." *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955, 958

(Fed.Cir.1993) (citations omitted). Thus, "small errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement." *Grumman Data Sys. Corp. v. Widnall,* 15 F.3d 1044, 1048 (Fed. Cir.1994) (citing *Lockheed Missiles & Space Co.,* 4 F.3d at 960). And "[u]ltimately, this court's task is to ensure that the contracting officer examined the relevant data and articulated a rational connection between the facts found and the choice made." *Banknote,* 56 Fed.Cl. at 390 (internal quotations omitted). Here, even assuming that the SSA erred in failing to review the challenged contracts, or to penalize Airtronic for its omissions, it is clear that the impact of those errors was negligible, at best. The court cannot conclude, therefore, that a rational basis for the SSA's decision in that regard is lacking.

**C. Price**

Plaintiff also claims that the SSA awarded Contract No. W52H09–05–D–0328 to Airtronic based on a mistaken belief that its proposal offered the most advantageous price to the government. PHT contends, specifically, that the SSA wrongly concluded "that his calling Airtronic's attention to a possible price mistake [was] legally effective to bind Airtronic to the prices set out in Airtronic's Competitive Proposal." Pl.'s Mot. at 20. Apparently, PHT posits that because the SSA requested verification of Airtronic's proposed price and Airtronic confirmed its accuracy, TACOM–RI assumed that the company was bound to produce the magazine cartridges at the price offered. PHT argues that this assumption is incorrect, however, because SSA Lemon violated his duty to inform Airtronic fully of the reasons he suspected a mistake in the offeror's proposal. PHT contends, in particular, that the awardee failed to include the costs of a required dry film lubricant in its price calculation, and that the SSA knew of that error, but failed to bring it to Airtronic's attention. Plaintiff insists that because Airtronic did not receive

---

**12.** The FAR standard termination for convenience clause provides that "[t]he Government may terminate performance of work under this contract in whole or, from time to time, in part if the Contracting Officer determines that a termination is in the Government's interest." 48 C.F.R. § 52.249–2; *see also T & M Distribs., Inc. v. United States,* 185 F.3d 1279, 1282 (Fed.Cir. 1999).

the required notice from defendant, it is not bound to perform the contract at the proposed price, but may, instead, seek reformation.

In response to this claim, Airtronic states that its proposal contained no error in pricing, and that it can and will supply the magazine cartridges, with the proper lubricant, at the agreed price. Intervenor-defendant also argues that PHT has cited no law which demonstrates the insufficiency of the SSA's price verification efforts. Airtronic contends that, on the record presented, there is no evidence that the SSA knew, or should have known, that Airtronic might have failed to include the price of the required lubricant in its price calculation, and so, a verification request which specifically mentioned that requirement was not necessary. Airtronic also notes that, because this is a fixed-price contract, no reformation of price is permitted. Int.'s Mot. at 27 (citing 48 C.F.R. § 16.202–1 (2005)). Moreover, Airtronic contends that, even if it could request a reformation, an exercise of that right would provide no relief to PHT. *Id.* at 25–27.

The United States also disagrees with PHT's argument, although it takes a different approach. Defendant asserts that plaintiff's allegation is without merit because "[t]he regulations requiring the contracting officer to follow specific verification procedures after discovering a potential mistake in an offeror's bid apply only to procurements conducted using the sealed bidding process." Def.'s Mot. at 15 (citing 48 C.F.R. § 14.407–3(g) (2005)). The United States points out that the solicitation was a "competitive negotiation through the receipt of competitive proposals," and thus contends that verification was not required. *Id.* at 16. In the

alternative, defendant argues that to the extent a duty to verify did exist, TACOM–RI satisfied that duty through discussions in which it "asked specifically whether Airtronic was aware of the requirement to provide a dry film lubricant to the plastic magazine follower," and later asked Airtronic to "recheck [its] figures on the cost of material, labor, tooling, overhead and profit." *Id.* at 16–17 (citing and quoting AR at 238–40, 343). Defendant states that "[t]hese discussions demonstrate that the contracting officer clearly communicated his concerns regarding a potential mistake in Airtronic's proposed prices and that Airtronic confirmed its prices in light of those specific concerns. Nothing more is required by the FAR or by those cases that address mistake in bidding." *Id.* at 17. Finally, the government notes that, although a price realism analysis was not required in advance of this fixed-price award, the SSA conducted one, and properly concluded that Airtronic's proposed price was reasonable. The United States states that "TACOM–RI's price evaluation fully satisfied the requirements of FAR Part 15 and was in accord with the discretion afforded the procuring agency in a 'best value' determination." *Id.* at 18.

■ The United States and Airtronic have raised a number of legitimate arguments in response to PHT's allegation. Not the least of these is intervenor-defendant's insistence that the claim, even if well-founded, would provide no relief to PHT. The court agrees. The Comptroller General has held, on numerous occasions, that a disappointed bidder's allegation of a mistake in the price verification efforts used to confirm an awardee's bid provides no basis for a bid protest.[13]

---

**13.** PHT certainly cannot protest the award on the ground that Airtronic's proposed price is too low. It is well settled that "in fixed-price contracting, 'below-cost pricing is not prohibited and the government cannot withhold an award from a responsible offeror merely because its low offer is below cost.... [T]he contract places upon the contractor the risk and responsibility for loss.'" *CC Distribs., Inc. v. United States,* 69 Fed.Cl. 277, 283 (2006) (quoting *Family Realty,* Comp. Gen. Dec., B–247772, 92–2 CPD ¶ 6, 1992 WL 167007 (1992)). Nor can plaintiff revive that argument by challenging the SSA's purported failure to verify a price which PHT believes is

unduly low, rather than challenging the price itself. *See and compare Reliable Trash Serv., Inc.,* Comp. Gen. Dec., B–258208, 94–2 CPD ¶ 252, 1994 WL 716848 (1994) (internal citations omitted) ("Our Office will not consider one offeror's claim that a lower offer may be mistaken since it is the responsibility of the contracting parties ... to assert rights and bring forth the necessary evidence to resolve mistake questions. While Reliable asserts that it is not protesting a mistake in Red River's offer, but rather, the Army's failure to request Red River to verify the offer, the underlying issue is the same—an alleged mistake in Red River's offer—and the same rule applies.

An example of such a holding is found in the Comptroller General's decision in *W.M. Schlosser Company Inc.,* Comp. Gen. Dec., B–254968, 93–2 CPD ¶ 201, 1993 WL 409530 (1993). In that proceeding, the W.M. Schlosser Company protested an award of a contract for building repairs to a competitor, Riley. Schlosser argued that Riley's bid should have been rejected because its price was so far below the government's estimate that there must have been a mistake. The Comptroller General rejected that claim outright, explaining that

> Schlosser ... does not have standing to claim an error in Riley's bid. Rather, it is the responsibility of the contracting parties—the government and the low bidder— to assert rights and bring forth the necessary evidence to resolve mistake questions.

*Id.* Accordingly, it refused to entertain Schlosser's protest. *Id.; accord Neighborhood Dev. Corp.,* Comp. Gen. Dec., B–246166, 92–1 CPD ¶ 162, 1992 WL 30838 (1992); *G & A Gen. Contractors,* Comp. Gen. Dec., B–244094, 91–2 CPD ¶ 204, 1991 WL 182205 (1991); *Johnny F. Smith Truck & Dragline Serv., Inc.,* Comp. Gen. Dec., B–236984, 90–1 CPD ¶ 4, 1990 WL 277543 (1990). Although the decisions of the Comptroller General are not binding on this court, they may properly be considered in cases in which, as here, the reasoning therein is highly persuasive.[14] *See Filtration Dev. Co. v. United States,* 59 Fed. Cl. 658, 664 n. 11 (2004); *ITT Fed. Servs. Corp. v. United States,* 45 Fed.Cl. 174, 191 (1999). In accordance with the Comptroller General's well reasoned and well settled holding on this matter, the court concludes that PHT lacks standing to protest on this ground.

▮▮▮▮ Moreover, even if plaintiff could pursue its protest based on a purported mistake in another's proposal, PHT's claim that the SSA violated his duty to verify Airtronic's price is equally problematic. Again, plaintiff's contention is that, although the SSA alerted Airtronic to a possible pricing mistake, his notification was insufficient. It is

true that, "[w]hen the government has notice of a mistake in a particular bid, the government may have a duty to verify that bid by calling attention to the specific error suspected." *Hunt Constr. Group, Inc. v. United States,* 281 F.3d 1369, 1376 (Fed.Cir.2002) (citing *Giesler v. United States,* 232 F.3d 864, 869 (Fed.Cir.2000); *Ruggiero v. United States,* 190 Ct.Cl. 327, 420 F.2d 709, 716 (1970)); *see also Conner Bros. Constr. Co. v. United States,* 65 Fed.Cl. 657, 690–91 (2005). Under the law of this court, a contracting officer who becomes aware of facts which give rise to a presumption of error must "verify the bid, 'calling attention to the specific error suspected, whether or not that error is reasonable.'" *Troise v. United States,* 21 Cl.Ct. 48, 62 (1990) (quoting and explaining the holding of *BCM Corp. v. United States,* 2 Cl.Ct. 602, 609 (1983)); *see also Giesler,* 232 F.3d at 869; *United States v. Hamilton Enters., Inc.,* 711 F.2d 1038, 1046 (Fed.Cir.1983); *Conner Bros.,* 65 Fed.Cl. at 691. Indeed, even when a mistake is merely suspected, the agency's duty to verify the accuracy of an offeror's proposal is triggered. *See Troise,* 21 Cl.Ct. at 63. And there is some authority for the proposition that the duty to verify arises in both negotiated procurements and sealed bidding. *See Griffy's Landscape Maint. LLC v. United States,* 46 Fed.Cl. 257, 259 (2000) (holding that the duty to verify exists regardless of whether a procurement is characterized as negotiated or sealed); *but see C.W. Over & Sons, Inc. v. United States,* 54 Fed.Cl. 514, 521 & n. 10 (2002) (disagreeing with holding of *Griffy's,* and noting that the regulation which creates the duty to verify appears only in the section of the FAR which addresses sealed bidding, and not in the section which addresses negotiated procurements).

Although the duty to raise mistakes in an offeror's proposal is no longer set forth explicitly in the regulations governing negotiated procurements, that duty undoubtedly still exists. There is no question that when, as here, an agency engages in discussions with offerors, it must make those discussions

---

Accordingly, we will not consider this basis of protest.").

14. It is also notable that, in its protest before the GAO, PHT lodged this very argument which was dismissed by the Comptroller General as an invalid basis for protest. AR at 116–17.

"meaningful." Under the FAR, this requires that "[a]t a minimum, the contracting officer must ... indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." 48 C.F.R. § 15.306(d)(3) (2005); *see also Banknote*, 365 F.3d at 1356–57. In other words, discussions are meaningful only "if they 'generally lead offerors into the areas of their proposals requiring amplification or correction, which means that discussions should be as specific as practical considerations permit.'" *Advanced Data Concepts, Inc. v. United States*, 43 Fed.Cl. 410, 422 (1999) (quoting *SRS Techs.*, Comp. Gen. Dec., B–254425.2, 94–2 CPD ¶ 125, 1994 WL 576118 (1994)); *see Consol. Eng'g Servs.*, 64 Fed.Cl. at 629 (stating that, without such information, discussions are not meaningful, and the agency has not satisfied the requirements of the FAR). Having said that, however, it must also be noted that "the government, when confronted with one bidder's unreasonable interpretation of the contract, does not have an obligation to verify *other* bids to ensure that no other bids incorporated the same unreasonable contract interpretation." *Hunt Construction*, 281 F.3d at 1376 (emphasis in original) (expressly disapproving of the holding of *BCM Corp.*, 2 Cl.Ct. at 609–10). Nor are government officials required to speculate as to the basis for a particular contractor's proposal. *See Troise*, 21 Cl.Ct. at 62. As the court in *Troise* explained, "[a] contrary rule would establish more than the good faith of the Government—it would make the United States an insurer of its contractor's mistakes." *Id.* at 63. Further, a plaintiff may recover based on a mistake in its proposal only upon evidence that the agency knew or should have known of the error at the time the bid was accepted. *CTA Inc. v. United States*, 44 Fed.Cl. 684, 695 (1999); *Chernick v. United States*, 178 Ct.Cl. 498, 372 F.2d 492, 496 (1967).

> The test of what an official in charge of accepting bids 'should' have known must be that of reasonableness, *i.e.*, whether under the facts and circumstances of the case there were any factors which reasonably should have raised the presumption of error in the mind of the contracting officer. Factors which may impute knowledge of error include: (1) facially apparent errors, such as multiplication errors made when computing unit prices into total price; (2) disparity in prices among the bids; (3) disparity between the bid and the private government estimate; (4) disparity between the bid and the cost of prior procurements of the same item; (5) disparity between the bid price and, if the contracting officer knows it, the market value for the goods.

*CTA, Inc.*, 44 Fed.Cl. at 695 (internal citations omitted) (quoting *Chernick*, 372 F.2d at 496 and citing other authority). Whether a source selection authority has fulfilled his duty of verification is a question of law to be decided by the court. *BCM Corp. v. United States*, 2 Cl.Ct. 602, 606 (1983) (citing *Wender Presses, Inc. v. United States*, 170 Ct.Cl. 483, 343 F.2d 961 (1965); J. Cibinic & R. Nash, *Government Contract Claims* 251 (1981)).

Here, to show that TACOM–RI's verification efforts were insufficient, PHT argues that

> [i]t is obvious from the detailed steps outlined in Airtronic's letter of July 15th, 2005 for production of the components of the M9 Magazine Cartridge that Airtronic omitted, in its pricing calculations, the requirement that the plastic cartridge followers be coated with solid-film, heat-cured lubricant, but the [SSA] did not on August 15th, or at any time since, call Airtronic's attention to this obvious omission.

Pl.'s Mot. at 12. PHT also contends that, when Airtronic verified the accuracy of its prices, the price lists it submitted to the agency also "show[ed] no costs for the required coating of the Magazine tube and the plastic cartridge follower," but that the SSA again failed to alert Airtronic to that omission. *Id.* Plaintiff relies on the holding of *BCM Corp. v. United States*, 2 Cl.Ct. 602, 610–11 (1983), to establish that these verification efforts lacked the required specificity, and so, were ineffective. In fact, PHT argues that the efforts were so lacking that they were tantamount to use of the "good

faith by checklist" method of verification, an approach which was rejected expressly by the court in *BCM. See* 2 Cl.Ct. at 610.

Before examining PHT's argument based on *BCM*, this court is constrained to note that the United States Court of Appeals for the Federal Circuit undermined the holding of that case significantly in 2002. In *Hunt Construction*, the Federal Circuit explained that

> [w]e are not aware of any binding authority obligating the government to verify all bids, where another bidder made a mistake in interpreting the provisions of an unambiguous contract. We decline to so hold, and we specifically disapprove of *BCM Corp. v. United States*, 2 Cl.Ct. 602, 609–10 (1983), to the extent that it appears to hold to the contrary.

281 F.3d at 1376. Considering the Federal Circuit's strong criticism of *BCM*, plaintiff's reliance on that opinion is questionable. Apparently, however, PHT hopes to rely on *BCM* for its limited guidance regarding the level of specificity required in a request for verification, and not for its now disfavored holding regarding the events which trigger the duty to verify. Unfortunately, the court finds that the portion of *BCM* which remains viable is not appropriately applied in this instance. Indeed, the circumstances here are easily distinguished from those considered in *BCM*.

In *BCM*, the government received bids on an electrical engineering project, several of which were considerably lower than the government's estimate for the job. After a request for verification of price was sent to one bidder, the agency discovered that the contractor had misread the requirements of the solicitation. 2 Cl.Ct. at 605. Later, the government sent a request for verification to BCM, which had also submitted a remarkably low bid. *Id.* In the request, however, the contracting officer did not alert BCM to its competitor's erroneous interpretation of the solicitation, nor did he elaborate on the actual requirements of the job. Instead, he sent a cursory letter which stated that BCM's bid was "[b]elow the government estimate and out of line with other bidders on the project ..., we suspect a mistake in bid."

*See id.* at 604 n. 2. On review, the Claims Court found that verification effort to be insufficient, since the contracting officer failed to call attention to the specific error suspected, noting that "[a] notation on the verification form to the effect that 'the contract includes replacement of existing feeders on Feeder Schedule' would have sufficed in this case ... that fact was within the contracting officer's knowledge when he verified BCM's bid, but was not communicated to BCM. In these circumstances the verification thus was less than a full disclosure." *Id.* at 611; *but see Hunt Construction*, 281 F.3d at 1376.

The record on review demonstrates that the SSA's verification efforts here were more specific than those deemed insufficient in *BCM*. It is uncontroverted that, after TA-COM–RI received Airtronic's proposal, the agency undertook a number of different pricing analyses to ensure that the quotations it had received were reasonable. The record shows, for example, that an initial price analysis was conducted on June 21, 2005. AR at 337. On August 15, 2005, the SSA sent a letter to Airtronic which stated:

> [i]t appears your offer under Solicitation No. W52H09–04–R–0119 for M9 Magazines may be in error. Your proposal offered unit prices ranging from [ ] for Ordering Periods 1–5 with a unit price of [ ] for the guaranteed minimum quantity of 900,000. It is therefore requested that you carefully recheck your figures on the cost of material, labor, tooling, overhead, and profit. History shows a unit price of $8.24 dated 13 Jul 2005 for a quantity of 275,000 each.

*Id.* at 343. Airtronic responded on the same day, and reported that, after a review, it had "found that prices related to raw material and energy ha[d] risen dramatically," and explained that it had to raise its proposed unit price by [ ] in the first ordering period. *Id.* at 245; IPAF ¶ 10. A final price analysis was conducted on August 31, 2005, and the Contract Pricing Team found Airtronic's prices to be reasonable. Plaintiff is correct in stating that when Airtronic submitted its amended price calculation list in response to the SSA's request for verification, its itemized statement of cost did not include an

entry which appeared to reflect the costs of the required coating.[15] *See* AR at 250. Were the court to consider that fact alone, it might be persuaded that Airtronic had miscalculated the costs of the required product, and that the SSA should have recognized that possibility. It is critical to recognize, however, that in addition to that list, the SSA also had the benefit of Airtronic's written assurances that it was aware of, and intended to comply with, the lubricant requirement. *Id.* at 241 ("Airtronic Services is aware of the dry film lubricant (SAE AS5272, type 1) requirement, and our proposed magazines will be in compliance with it."). PHT has provided no support for its contention that, after having received such a specific confirmation from Airtronic, the receipt of a generalized price breakdown list which failed to specifically earmark the costs of the required lubricant should have alerted the SSA to the possibility (notably, one which Airtronic continues to emphatically deny) that intervenor-defendant failed to appreciate the requirement or its attendant expense. Indeed, plaintiff has not controverted, in any way, intervenor-defendant's unequivocal assertion, at all stages of the procurement, that it understood the requirement.[16] It follows that, to the extent the SSA was aware of a possible mistake in Airtronic's price proposal, his request for verification of costs, via the discussion and price verification documents, was sufficiently specific.

The court cannot conclude, on this record, that the United States "knew or should have known" that Airtronic did not understand the solicitation's technical requirement that it coat each magazine cartridge with a dry film lubricant, and failed in its duty to rectify that misunderstanding.

## D. Duty of Good Faith and Fair Dealing

Finally, PHT seeks damages and equitable relief based on the government's alleged breach of the duty of good faith and fair dealing. Airtronic argues, however, that this claim fails outright, because it is premised on each of PHT's other, meritless, claims. Int.'s Mot. at 27 (citing *Unified Architecture & Eng'g, Inc. v. United States*, 46 Fed.Cl. 56, 61 (2000)). Intervenor-defendant contends further that, because of the purely derivative nature of this allegation, the court need not address it separately.

It is beyond question that "[t]his Court's bid protest jurisdiction is no longer premised on the theory of the breach of an implied-in-fact contract." [17] *Hunt Building*, 61 Fed.Cl. at 273. This court has noted, however, that "the issuance of a competitive solicitation which generates responsive offers gives rise to an implied contract of fair dealing." *Id.* (citing *Heyer Prods. Co. v. United States*, 135 Ct.Cl. 63, 140 F.Supp. 409, 412 (1956)). Indeed, "the government is said to breach the implied contract if its consideration of offers is found to be arbitrary and capricious toward the bidder-claimant." *Id.* (quoting *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1132 (Fed.Cir.1998)). Here, as Airtronic correctly points out, each of the actions complained of by PHT has been found to be reasonable, and proper under the law. Accordingly, there are no grounds on which to conclude that the agency's consider-

---

**15.** The categories of costs listed included: "Stamping, Main; Stamping, Plating; Stamping, Button; Button Plating; Follower; Spring; Spring Plating; Bottom; Packaging; Assy Labor; Shipping; Tool Amortization." AR at 250.

**16.** Plaintiff also attempts to show that Airtronic's proposed price was remarkable because it was drastically less than the historical unit price for M9 cartridges. PHT has not, however, controverted the government's position that the decrease was reasonable, based on the higher total number of magazines to be produced, or Airtronic's explanation that it planned to do some manufacturing work in house, thereby lowering the unit price even further.

**17.** The Federal Circuit has not specifically prohibited the implied-in-fact contract theory of recovery in bid protest actions. *See Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1082 n. 9 (Fed.Cir.2001); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n. 6 (Fed.Cir.2001). This court, however, has done so repeatedly. *See Block v. United States*, 66 Fed.Cl. 68, 76–77 (2005); *Lion Raisins, Inc. v. United States*, 52 Fed.Cl. 115, 120 (2002); *Hunt Bldg. Co. v. United States*, 61 Fed.Cl. 243, 273 (2004); *Ramcor Servs. Group, Inc. v. United States*, 41 Fed.Cl. 264, 268 (1998), *aff'd in part and vacated in part*, 185 F.3d 1286, 1289 (Fed.Cir.1999).

ation of plaintiff's proposal was arbitrary and capricious.

Because PHT has failed on the merits of each of its claims, its request for a permanent injunction must be denied. *See PGBA, LLC,* 389 F.3d at 1229. No discussion of the other factors relevant to the court's consideration of permanent injunctive relief is necessary. *Id.*

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** as follows:

(1) Plaintiff's Motion for Judgment on the Administrative Record, including all of its requests for injunctive and declaratory relief, filed January 24, 2006, is **DENIED.** Defendant's and intervenor-defendant's Cross–Motions for Judgment on the Administrative Record, filed February 8, 2006, are **GRANTED;**

(2) The Clerk's Office is directed to **ENTER** final judgment dismissing the complaint with prejudice in this action;

(3) On or before **April 30, 2006,** counsel for each party shall file with the Clerk's Office a redacted copy of this opinion, with any material deemed proprietary marked out in brackets, so that a copy of the Opinion can then be prepared and made available in the public record on this matter; and

(4) Each party shall bear its own costs.